IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA f/u/b/o
SACHS ELECTRIC COMPANY,                    *
1572 Larkin Williams Road
Fenton, Missouri 63026                     *

     **Plaintiff,**                        *

vs.                                        *    Civil Action No.

UNITED STATES FIDELITY AND                 *
    GUARANTY COMPANY                      *
11 Schilling Road
Hunt Valley, Maryland 21031                *

                   *

Serve:     Lawrence H. Mirel
           Commissioner of Insurance         *
           810 First Street, NE
           Suite 701                         *
           Washington, DC 20002
                     *

     **Defendant.**
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT ON PAYMENT BOND

COMES NOW Plaintiff District of Columbia f/u/b/o Sachs Electric Company, by and through its counsel Quagliano & Seeger, P.C., and for its Complaint against Defendant United States Fidelity and Guaranty Company, states and alleges as follows:

## PARTIES

1.    Plaintiff Sachs Electric Company (hereinafter "Sachs") is, and at all times mentioned herein was, a corporation duly organized and existing under the laws of the State of Missouri with its principal place of business located at 1572 Larkin Williams Road, Fenton, Missouri 63026. At all times relevant hereto, Sachs was engaged in, *inter alia*, the business of electric subcontracting and is properly licensed to do business in the District of Columbia.

2.      Defendant United States Fidelity and Guaranty Company (hereinafter "USF&G")
is, and at all times mentioned herein was, a corporation duly organized and existing under the
laws of the State of Maryland with its principal place of business located at 385 Washington
Street, St. Paul Minnesota 55102.  USF&G is properly licensed and registered to transact
business, including issuing bonds in the District of Columbia.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1332 in that the amount in controversy, exclusive of interests and costs, exceeds the sum of
Seventy-Five Thousand Dollars ($75,000.00), and there is complete diversity of citizenship
between the Plaintiff and Defendant.

4.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(1) because the
Defendant conducts business in this Judicial District and is subject to *in personam* jurisdiction in
the District of Columbia.

**FACTS**

A.    **Unpaid Subcontract Balance**

5.      On or before February 7, 2002, The Whiting-Turner Contracting Company
(hereinafter "Whiting-Turner"), as general contractor, entered into an agreement (hereinafter
"Prime Contract") with the District of Columbia Water and Sewer Authority (hereinafter
"WASA"), as Owner, for work and improvements to be performed on the Bryant Street Pumping
Station Rehabilitation Project, located at 301 Bryant Street NW in the District of Columbia
(hereinafter "Project").

6.      In accordance with District of Columbia Code § 2-305.4 and in connection with
its work at the Project, on or about February 7, 2002, Whiting-Turner, as Principal, and USF&G,

2

as Surety, executed and delivered to WASA, as Obligee, a Payment Bond, Bond No. 400SN8748 (hereinafter "Payment Bond" or "Bond"), pursuant to which USF&G guaranteed Whiting-Turner's prompt payment to those supplying labor and/or materials in the prosecution of the work provided for in the Prime Contract. A true and correct copy of the Payment Bond is attached hereto and incorporated by reference at Exhibit 1.

7.      The penal sum of the payment bond is Twenty Million Four Hundred Eighty Seven Thousand Five Hundred Dollars ($20,487,500.00).

8.      On or about February 13, 2002, Whiting-Turner, as general contractor, and Fischbach & Moore Electric, Inc. ("Fischbach"), as subcontractor, entered into a Subcontract Agreement (hereinafter "Subcontract") whereby Fischbach agreed to supply labor and materials for the performance of certain electrical work for the Project for the Subcontract price of Eight Million Five Hundred Eighty Four Thousand Two Hundred Dollars ($8,584,200.00), subject to additions and deductions provided in the Subcontract, exclusive of plans, specifications and addenda. A true and correct copy of the Subcontract is attached hereto and incorporated by reference at Exhibit 2.

9.      On or about June 18, 2003, Whiting-Turner consented to Fischbach's assignment of the Subcontract to Sachs (the "Assignment"). A true and correct copy of the Assignment is attached hereto and incorporated by reference at Exhibit 3.

10.     Sachs substantially completed all of its work under the Subcontract, but Whiting-Turner has failed or refused to remit payment to Sachs pursuant to the terms of the Subcontract.

**B.    Subcontract Change Orders**

11.    After Sachs commenced work at the Project, Whiting-Turner and Sachs negotiated and agreed to specified additional services to be provided under the Subcontract by means of change orders.

12.    Specifically, Sachs performed additional work at the Project at Whiting-Turner's direction and pursuant to Change Order Nos. 16A-001 through 16A-031 (collectively, the "Approved Change Orders") totaling Seven Hundred Nineteen Thousand One Hundred Ninety One and 66/100 Dollars ($719,191.66).

13.    In addition to the Approved Change Orders, during the course of Sachs' work at the Project, Whiting-Turner requested and Sachs provided additional labor, material and other miscellaneous services at the Project.

14.    Specifically, Sachs performed additional work at the Project at Whiting-Turner's direction totaling One Hundred Seventy Thousand Seven Hundred One and 04/100 Dollars ($170,701.04) (collectively referred to as the "Pending Change Orders").

**C.    SCADA Wiring Claim**

15.    During Sachs' performance at the Project, Sachs discovered that the project drawings were inadequate and incomplete.

16.    By way of example and not limitation, the electrical drawings indicate all cable wiring shall be terminated at the benchboard.    The electrical drawings failed to include and/or indicate any cable wiring between the benchboard and the SCADA Relay Panels.

17.    As a result of the inadequate and incomplete drawings and in an effort to mitigate delays beyond the responsibility and control of Sachs, Whiting-Turner directed Sachs to provide

additional wiring between the benchboard and the SCADA Relay Panels (the "SCADA Wiring Claim").

18.    Specifically, Sachs performed additional services related to the SCADA Wiring Claim totaling Three Hundred Twenty-Six and Fifty-Two Dollars ($326,052).

**D.    Additional Labor & Productivity Claim**

19.    In preparing its estimate for the Subcontract, Sachs reasonably relied upon the accuracy of the Project plans and specifications, the planned Project schedule and the existing site conditions as represented by Whiting-Turner and the Owner.

20.    During Sachs' performance at the Project, Whiting-Turner actively interfered with Sachs' progress of its work at the Project by, *inter alia*, unreasonably revising Sachs' schedule of work at the Project and ordering Sachs to perform extra work for the benefit of the Owner and Whiting-Turner.

21.    Further, in an effort to mitigate delays beyond the responsibility and control of Sachs, Whiting-Turner unreasonably and substantially modified Sachs's means and methods of construction of the Project without any consultation or agreement by Sachs for such modification.

22.    Whiting-Turner further breached the Subcontract by, *inter alia*,    (i) failing to provide Sachs with accurate, up-to-date schedules for the Project, (ii) failing to timely prepare the Project site to receive Sachs' work, (iii) failing to properly supervise the work of other subcontractors so as not to unreasonably interfere with and disrupt the work of Sachs, (iv) failing to properly supervise the work of other third-parties so as not to unreasonably interfere with and disrupt the work of Sachs, and (v) requiring Sachs to work overtime at an accelerated pace in an inefficient, piecemeal and haphazard manner.

23.    Whiting-Turner's failure to properly plan, manage, schedule and coordinate the work at the Project was grossly negligent.

24.    As a result of the Owner and Whiting-Turner's directed changes, unreasonable interference, delays and disruptions, Sachs incurred additional labor and lost productivity costs at the Project in an amount not less than Two Million Four Hundred Twenty-Five Thousand Forty-Nine and 04/100 Dollars ($2,425,049) (the "Additional Labor & Productivity Claim").

25.    Sachs properly and timely submitted its Additional Labor & Productivity Claim to Whiting-Turner.

26.    Despite repeated demand, Whiting-Turner has failed or refused to compensate Sachs for the value of its Additional Labor & Productivity Claim

**E.    <u>Damage Summary</u>**

27.    Sachs has fully and faithfully performed all of its obligations under the Subcontract and Approved Change Orders, Pending Change Orders, and SCADA Wiring Claim.

28.    Despite proper demand for payment in full of all amounts due, Sachs has not received payment of Three Million Five Hundred Eighty-Four Thousand Four Hundred Eighty and 55/100 Dollars ($3,584,480.55) in earned Subcontract funds and additional labor and productivity cost.

29.    Whiting-Turner is liable for:

| | |
|---|---|
| Unpaid Subcontract Balance..................................... (including Approved Change Orders) | $   662,678.51 |
| Pending Change Orders ......................................... | $   170,701.04 |
| SCADA Wiring Claim ........................................... | $   326,052.00 |
| Additional Labor & Productivity Claim ...................... | $ 2,425,049.00 |
| **Balance Due Sachs............................................** | **$ 3,584,480.55** |

30.    Whiting-Turner materially breached the Subcontract by, *inter alia*, failing to pay Sachs monies due.

6

**F.     Bond Claim**

31.     In accordance of the Payment Bond, by letter dated March 7, 2007, Sachs notified USF&G of its claim for payment on the Payment Bond via certified mail, return receipt requested.  A true and correct copy of Sachs' Notice letter is attached hereto and incorporated by reference at Exhibit 4.

32.     Despite demand, USF&G has failed to pay Sachs for the unpaid labor and materials furnished and supplied by Sachs to the Project pursuant to the Subcontract, Change Orders and Additional Labor & Productivity Claim for which USF&G guaranteed payment under the Payment Bond.

33.     More than ninety days (90) has passed since Sachs' last performed work at the Project.

**COUNT I**
**SUIT ON THE PAYMENT BOND**

34.     Sachs incorporates by reference Paragraphs 1 through 33 as if fully set forth herein.

35.     Sachs is a proper claimant under the Payment Bond and the District of Columbia Little Miller Act.

36.     Under the Payment Bond, USF&G is liable to Sachs for all costs of labor and material used or reasonably required for prosecution of the work at the Project.

37.     Despite demand for payment in full of all amounts due and owing under the Subcontract, Approved Change Orders, Pending Change Orders, SCADA Wiring Claim and Additional Labor & Productivity Claim, Sachs has not received payment of Three Million Five Hundred Eighty Four Thousand Four Hundred Eighty and 55/100 Dollars ($3,584,480.55) in earned funds for the labor and materials it provided at the Project.

7

38.    USF&G has failed and refused to pay monies due and owing under the Payment Bond.

39.    Sachs has satisfied any and all conditions precedent to bringing this action on the Payment Bond.

**WHEREFORE,** Sachs Electric Company respectfully prays that this Honorable Court enter judgment in its favor and against United States Fidelity and Guaranty Company, in an amount not less than Three Million Five Hundred Eighty Four Thousand Four Hundred Eighty and 55/100 Dollars ($3,584,480.55), together with prejudgment interest, post judgment interest, costs and expenses, including attorneys' fees, expended in this behalf and such other relief as the Court deems just.

**Dated: January 2, 2008**                          Respectfully submitted,

                                       **QUAGLIANO & SEEGER, P.C.**

                                       Seth A. Robbins, Bar No.: 471812
                                       2620 P Street, NW
                                       Washington, DC 20007
                                       Tel. (202) 822-8838
                                       Fax. (202) 822-6982
                                       e-mail: Robbins@quagseeg.com
                                       **Counsel for Plaintiff**
                                       **District of Columbia f/u/b/o**
                                       **Sachs Electric Company**

# DISTRICT OF COLUMBIA
## WATER AND SEWER AUTHORITY

| | |
|---|---|
| **PAYMENT BOND**<br>**(CONSTRUCTION)**<br>(see instructions on reverse) | Bond No. 400SN8748<br><br>Date Bond Executed (Must be same or later than date of Contract)<br>FEB - 7 2002 |

**PRINCIPAL** (Legal Name and Address)

THE WHITING-TURNER CONTRACTING CO.
300 EAST JOPPA ROAD
BALTIMORE, MD 21286

**TYPE OF ORGANIZATION (X)**

☐ INDIVIDUAL      ☐ PARTNERSHIP

☐ JOINT VENTURE      ☒ CORPORATION

**STATE OF INCORPORATION**
MARYLAND

**SURETY (IES)** (Name (s) and Address (es))

UNITED STATES FIDELITY
AND GUARANTY COMPANY
5801 SMITH AVENUE
BALTIMORE, MD 21209

**PENAL SUM OF BOND**

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENT(S) |
|---|---|---|---|
| 20 | 467 | 500 | 00 |

| CONTRACT DATE | CONTRACT NUMBER |
|---|---|
| FEB -7 2002 | 01-0050 |

KNOW ALL MEN BY THESE PRESENTS, that we, the Principal and Surety(ies) hereto are firmly bound to the District of Columbia Government, a municipal corporation, hereinafter called the District, in the above penal sum for the payment of which we bind ourselves, our heirs, executors, and successors, jointly and severally; Provided, that, where the Surety(ies) are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly" and severally" only for the purpose of allowing a joint action or actions against any or all of us, and for all other purposes each Surety binds itself, jointly and severally with the Principal, for the payment of such sum only as is as set forth opposite the name of such Surety, but if no limit of liability is indicated, the limit of liability shall be the full amount of the penal sum.

THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the Principal entered into the Contract identified above.

NOW, THEREFORE, if the Principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in the Contract, and any and all duly authorized modifications of the Contract that may hereafter be made, notice of which modifications to the Surety(ies) being hereby waived, then the above obligation shall be void; otherwise to remain in full force and virtue.

IN WITNESS WHEREOF, the principal and Surety(ies) have executed this payment bond and have affixed their seals on the date set forth above.

| | | PRINCIPAL | |
|---|---|---|---|
| 1 Signature | | 1. Attest | |
| *(signature)* (Seal) | | *(signature)* | |
| Name & Title (typed)  W. DANIEL WHITE<br>SENIOR VICE PRESIDENT | | Name & Title (typed)  Charles A. Irish<br>Secretary | CORPORATE SEAL |
| 2. Signature | | 2. Attest | |
| Name & Title (typed) | | Name & Title (typed) | CORPORATE SEAL |
| *(Seal)* | | | |

rm No. DC 2540-5

**EXHIBIT 1**

## SURETY (IES)

| Name & Address (typed) United States Fidelity and Guaranty Company, 5801 Smith Avenue, Baltimore, MD  21209 | | State of Inc. MARYLAND | Liability Limit |
| --- | --- | --- | --- |
| Signature of Attorney-In-Fact | Attest (Signature) | | CORPORATE SEAL |
| Name & Address (typed) Brian E. Wilcox, HMS Insurance Associates, Inc., 10751 Falls Road, Suite 256 Brooklandville, MD 21022 | Name & Address Denise Kelly HMS Insurance Associates, Inc. 10751 Falls Road, Suite 256 Brooklandville, MD 21022 | | |
| 1. Name & Address (typed) | | State of Inc. | Liability Limit |
| Signature of Attorney In-Fact | Attest (Signature | | CORPORATE SEAL |
| Name & Address (typed) | Name & Address(typed) | | |

## BOND PREMIUM

| Rate Per Thousand First $500,000.00 @ $9.00 Ext $500,000.00 @ $7.95 Ext $2,000,000.00 @ $5.35 Ext $2,500,000.00 @ $4.75 Ext $2,500,000.00 @ $4.30 Ver $7,500,000.00 @ $4.00 "Premium includes a 19% Surcharge Based on Completion Time" | Total Premium $203,329.35 Approved by: | Name & Address of Agency or Agent Receiving Commission HMS Insurance Associates, Inc. 10751 Falls Rd. Suite 256 Brooklandville, MD 21022 |
| --- | --- | --- |

Jerry N. Johnson
DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY
CONTRACTING OFFICER                                      2/7/02

## INSTRUCTIONS

1. The full legal name and business address of the Principal shall be inserted in the space designated 6.Principal" on the face of this form. The bond shall be signed by the authorized person signing the Contract. When such person signing is other than the President or Vice-President of a corporation, evidence of authority shall be furnished. Such evidence shall be in the form of either an Extract of Minutes of a Meeting of the Board of Directors, or Extract of Bylaws, certified by the Corporate Secretary, or Assistant Secretary and with Corporate Seal affixed thereto.

2. Corporations executing the bond as sureties shall be among those appearing on the U.S. Treasury Department's list of approved sureties and shall be acting within the limitations set forth therein, and shall also be licensed by the Insurance Administration, Department of Consumer and Regulatory Affairs, to do business in the District of Columbia. The surety shall (1) insert on the bond form the name and addresses of the agency receiving the commission; and (2) attach an adequate Power-of-Attorney for each representative signing the bond.

3. Corporations executing the bond shall affix their Corporate Seals. Individuals shall sign full first name, middle initial and last name opposite the word "seal"; two witnesses shall sign and include their addresses, under the word "witness". If executed in Maine or New Hampshire, an adhesive seal shall be affixed.

4. The name of each person signing this performance bond shall be typed in the space provided.

Rev. July 1996

#6-p4562-2 wd-206

SUBCONTRACT

# THE WHITING-TURNER CONTRACTING COMPANY

Address Reply to:          300 East Joppa Rd.
                           Baltimore, MD 21286

---

SUBCONTRACT NO.        9240-16A

SUBCONTRACT FOR        Electrical Work

SUBCONTRACTOR          Fischbach & Moore Electric, Inc.
     Address           7941 Woodruff Ct.
                       Springfield, VA 22151

Remittance Address     Same

OWNER                  D.C. Water and Sewer Authority (DC WASA)
                       5000 Overlook Avenue, S.W.
                       Washington, D.C. 20032

PROJECT                Rehabilitation of the Bryant Street Pumping Station
                       301 Bryant Street, N.W.
                       Washington, D.C. 20001

This agreement, made this      13th      day of      February      2002, by and between
                              Fischbach & Moore Electric, Inc.
hereinafter called the Subcontractor, and THE WHITING-TURNER CONTRACTING COMPANY, of Baltimore Maryland, a body corporate
of the State of Maryland, hereinafter called the Contractor,
     WITNESSETH, that the Subcontractor and Contractor for the consideration hereinafter named, agree as follows:

ARTICLE 1. DEFINITIONS—
    (a) As used herein, the following terms shall have the meanings indicated:
    "Architect" or "Engineer" means the architect or engineer directing the work as agent of the Owner, or any other person authorized
by the General Contract to direct or pass upon any matter or thing connected with the performance of the General Contract.
    "Contract Documents" means (a) the General Contract, (b) all general, supplementary and other conditions applicable to the Project,
(c) the Drawings and Specifications, and (d) all bulletins and addenda issued in connection with the Project.
    "Drawings and Specifications" means the drawings and specifications described in Article 2 hereof, and all addenda and/or revisions
thereto.
    "General Contract" means the contract executed or to be executed by the Owner and the Contractor in connection with the
construction of the Project and any amendments thereto.
    "Owner" means the Owner described above.
    "Project" means the Project identified above.
    (b) Where the term "Contractor" is used in the Specifications, insofar as it has application to the work required to be done by the
Subcontractor as provided herein, it shall be deemed for the purposes hereof to refer to the Subcontractor. The term "Contractor" or "General
Contractor" when used in the Contract Documents shall be deemed to have reference to the Subcontractor insofar as it has application to the
work covered by this Subcontract. The term "Subcontractor" may be referred to as "it" whether Subcontractor is incorporated or not.

C-013
12/05/2000                              SC 1

Initialed by:
Contractor: 

EXHIBIT 2

THE WHITING-TURNER CONTRACTING COMPANY

ARTICLE 2. SCOPE OF WORK--The work to be performed and materials to be furnished by the Subcontractor, as specified in Article 3 hereof and in accordance with Drawings and Specifications prepared by Whitman, Requardt and Associates, LLP

dated                    August, 2001                    , are outlined as follows:

### Specific Scope of Work:

This work shall include all labor, supervision, material, tools, equipment, shop drawings, submittals, layout, unloading, scaffolding, ladders, hoisting, transportation, taxes, permits, engineering, support functions, insurance, bonds, and any other items or services necessary for and reasonably incidental to the proper execution and completion of the work, whether temporary or permanent, in accordance with all drawings, specifications, addenda, general conditions, requirements, and other related documents as indicated herein. The scope of work shall include but not be limited to the following:  (All work shall be furnished and installed unless specifically noted otherwise herein.)

**Applicable specification sections:**
   This work primarily includes but is not limited to the following specification sections as well as related work specified or shown elsewhere in the contract documents:
- DC WASA Special Provisions (SP)
- DC WASA General Provisions (GP)
- Division 1 – General Conditions/General Requirements (Including Technical Modifications in Section 01008).
- SP-12, GR-9, GR-15-19 – Submittals.
- Division 16, all sections.
- 13851 – Fire Alarm

1.  Provide a Performance Bond
2.  Metering and electric distribution system to panel boards
3.  Complete wiring system for power, lighting, receptacles, and special systems as shown on the electrical drawings.
4.  Fire alarm system.  Coordinate with elevators for shut-down and fireman's recall.  Electrical subcontractor to wire all tamper and flow switches installed by the fire protection subcontractor as shown on the electrical drawings.
5.  Equipment connections for electrical equipment Equipment connections are single point connections unless otherwise noted.
6.  Emergency and exit lighting as shown.
7.  Interior and exterior fixtures
8.  Panels, switches, receptacles, pull boxes, conduit, wiring, etc.
9.  Equipment connection for HVAC. Equipment connections are single point connections unless otherwise noted.
10. Provide power wiring of shades specified in 12492 from two dedicated 20 amp power sources (by shade manufacturer) to power source.
11. Furnish access panels required in walls and ceilings
12. Furnish and install conduit and supports for underground ductbanks.  Excavation, concrete and backfill by others.
13.
14. Identification labels
15. Below and above slab conduit/wiring
16. Cutting/patching/firesafing of penetrations where required
17. Sleeves for penetrations/fireproof all penetrations
18. Cabinets, panelboards & switchboards
19. Motor starters and controls as shown on the electrical drawings.
20. Motor control centers
21. Install, maintain, and remove temporary power for WT and Engineer trailers.
22. Install, maintain, and remove temporary power and lighting for building.  Temporary lighting to be installed in accordance with anticipated partition layout to provide per OSHA requirements, but not less than 2  foot-candles @ any location in the building. . All temporary power to be in accordance with OSHA requirements (ground fault) and to be placed so that no extension chord greater than 100 ft. will be required.
23. Temporary power for elevator/escalator installations if required
24. Rough-in/hookup for equipment and fixtures furnished and installed by others as shown on the electrical drawings.
25. Installation of equipment and fixtures furnished by others as shown on the electrical drawings.

C-013
12/05/2000                                    SC 2

Initialed by:
Contractor: _____  Subcontractor: 

THE WHITING-TURNER CONTRACTING COMPANY

26. Fire rated termination boards.
27. Coordinate location of all materials/equipment above ceilings with other trades.  Any conflicts must be resolved prior to the start of work.
28. All equipment must be located in accordance with the drawings and all code requirements
29. Provide labor, standby mechanics, and equipment for all testing and startup (fire alarm, elevator, smoke control, etc.).
30. Provide cutting and capping of existing systems for electrical demolition.  Clearly mark all abandoned systems to be demolished.
31. Provide power and make connections of motor operated dampers installed by others.
32. Telephone, CATV, and other data conduits with pull strings
33. All support members required for hanging raceways, conduit, lights, panels, disconnects, telephone backboard, etc.  This includes in-wall blocking required to support any electrical equipment.
34. Removal of all trash, debris and spoils generated by this work to a dumpster provided by WT



Initialed by:
Contractor: _____ Subcontractor: _____

THE WHITING-TURNER CONTRACTING COMPANY

**ARTICLE 3. PROVISION OF LABOR AND MATERIALS–**

(a) The Subcontractor agrees to furnish and pay for all labor and supervision, tools, apparatus, supplies, equipment, and services, and also to furnish, deliver, install, and pay for all materials necessary for the performance and completion of the work described under the Scope of Work, free from all claims of materialmen, suppliers, laborers, truckers, subcontractors, and others making claims through the Subcontractor. All such work shall be done to the satisfaction of the Owner and/or Engineer, and the Contractor in accordance with the Contract Documents, all of which Documents shall be made a part of this Subcontract. Subcontractor agrees to submit daily work reports and monthly progress reports and schedule updates upon request by the Contractor. The Subcontractor agrees that with respect to the Scope of Work hereunder it will stand in the Contractor's shoes with respect to the Contractor's obligations to the Owner under the Contract Documents and will perform all work and obligations as set forth on the Contract Documents to the satisfaction of the Owner. At all times that Subcontractor has personnel at the Project site, it shall also have present an authorized representative of Subcontractor who shall supervise and direct Subcontractor's personnel and be responsible for their actions. Such representative shall be authorized to act on behalf of the Subcontractor and communications to such representative shall be binding upon Subcontractor.

(b) In the event any deviations from the Contract Documents are incorporated in any shop drawings of or by the Subcontractor, such deviations and the reasons therefore shall be fully explained in writing by separate letter to the Contractor and Owner at the time the shop drawings are submitted to the Contractor and Owner. Failure to so specify and explain any such deviation will automatically void any inadvertent approval of the same by the Contractor, Architect, Engineer and/or Owner.

(c) The Subcontractor represents and warrants that it is an expert in the particular line or lines of work herein contracted to be done and that it is competent to know whether the materials, methods and apparatus specified for this work are sufficient and suitable to secure the results contemplated by the Contract Documents. The Subcontractor agrees to be responsible for fulfilling the requirements of said Contract Documents by following them strictly unless, prior to the beginning of his work, Subcontractor formally objects to certain specific items, or apparent discrepancies as being inadequate or unsuitable to accomplish the desired results and Contractor and Architect have formally agreed to a remedial solution in writing.

Subcontractor agrees to cooperate in carrying out Contractor's quality assurance program including, but not limited to, furnishing necessary documentation and facilitating inspections and quality checks.

(d) The Subcontractor agrees to employ for such work as Contractor designates and at any time requested by Contractor, employees represented for purposes of collective bargaining by such labor organizations as Contractor specifies. With respect to such employees, the Subcontractor agrees to be bound by the terms and provisions of the agreement establishing the Impartial Jurisdictional Disputes Board, any such successor Board, or any subsequent method agreed to be employers and the unions affiliated with the Building and Construction Trades Department, AFL-CIO, for the settlement of jurisdictional disputes and the Subcontractor also agrees that any assignments of disputed work shall be made in accordance with any agreement of record between the disputing trades, or any published decision of record compiled and published by the Building and Construction Trades Department, AFL-CIO in 'Agreements and Decisions Rendered affecting the Building Industry.'

**ARTICLE 4. DILIGENT PERFORMANCE–**

(a) Subcontractor agrees to commence, pursue diligently and complete the work in such sequence and order and according to such schedules as Contractor shall establish from time to time during the course of the work, and shall perform the work so as not to delay any other trades or contractors, time being of the essence of this Subcontract. Any written dates furnished by the Subcontractor and approved by Contractor and Owner for delivery of materials, samples, shop drawings, etc., shall become a part of this Subcontract. Subcontractor shall immediately notify Contractor in writing of any interruption on the job or late delivery which causes or may cause a delay in Subcontractor's performance. No extension of completion date shall be permitted unless approved in writing by the Contractor and Owner, and Subcontractor shall be responsible for any losses or penalties incurred as a result of delays in completing its work. Subcontractor shall work overtime or shift work if deemed necessary, in the judgment of the Contractor to maintain the progress of the work. Any such overtime or shift work required to maintain progress or to complete the work on a timely basis shall be at Subcontractor's expense and shall not be charged to Contractor unless specifically authorized in writing by the Contractor prior to the commencement of such overtime or shift work.

(b) Contractor shall have the right at any time to delay or suspend the work or any part thereof without incurring liability therefor. An extension of time shall be the sole and exclusive remedy of Subcontractor for any such delays or suspensions, but only to the extent that a time extension is obtained from the Owner. In the event that Contractor obtains additional compensation from the Owner or others for delay or interference, Subcontractor shall be entitled to share pro rata in such additional compensation, as determined in the good faith judgment of the Contractor.

(c) Subcontractor shall cooperate fully with Contractor in providing promptly any information requested by Contractor in connection with preparation of schedules for the Project, including, but not limited to, detailed information concerning the sequence, beginning and ending dates of activities, cost breakdowns related to such activities, and any information requested for Critical Path Method scheduling if used for the Project. The costs of all such activities on the part of Subcontractor are included in the Subcontract Amount.

(d) In the event of any dispute under this Subcontract or as to the work to be performed, Subcontractor shall continue to diligently perform the work as directed by Contractor without interruption, deficiency or delay.

**ARTICLE 5. PAYMENT–**

(a) Payment of the Subcontract amount, and any additional sums for extras, as provided for herein (including additional compensation payable under Article 9(k)), shall be made as follows: The Contractor shall, subject to the provisions of subparagraph (c) hereof, pay to the Subcontractor an amount equal to ninety percent (90%) of the value of the work performed by the Subcontractor as determined by the Architect and approved by the Contractor during any calendar month within fifteen (15) days after payment therefor has been received by the Contractor from the Owner, or within such shorter period specified by applicable law, statute or regulation. The Contractor shall be under no obligation to make any payment to the Subcontractor except to the extent that the Contractor has received funds from the Owner for the work invoiced by the Subcontractor; that is to say, the Subcontractor shall not be entitled to payment if for any reason, including the Owner's financial situation or lack of available funds, the Owner fails to pay the Contractor in accordance with the General Contract; such payment from the Owner being a condition precedent to any obligation of Contractor to Subcontractor. Retainage and any other balance of the Contract Amount shall be payable fifteen (15) days (or within such shorter period specified by applicable law, statute or regulation) after the work under this Agreement has been completed and accepted by the Owner, Architect, and Contractor and following approval by the Architect of the final application for payment, and settlement of all claims, if any, under this Agreement, provided that Subcontractor has fully performed all of its obligations hereunder. Before paying any amount due to the Subcontractor as provided hereinabove, the Contractor is hereby authorized to deduct therefrom and offset an amount equal to any and all sums or obligations owing by the Subcontractor to the Contractor and costs necessary to complete the work to be performed under this Subcontract, and any and all claims liquidated or unliquidated, by the Contractor against the Subcontractor, arising hereunder, under any other contract or agreement between the Subcontractor and the Contractor or from any other liability or obligation of the Subcontractor to the Contractor whether under this Subcontract or otherwise.

C-013
12/05/2000

SC 4

Initialed by:
Contractor: _____  Subcontractor: _____

THE WHITING-TURNER CONTRACTING COMPANY

(b) The Subcontractor agrees to submit to the Contractor applications for payment by the 25th of each month, or as provided for in the Contract Documents so as to enable the Contractor to apply for payment. As a condition precedent to the payment of any requisition, the Contractor may require the Subcontractor to (1) produce waivers of mechanics lien rights by all persons supplying labor materials to the Subcontractor on the job through the date of requisition and by the Subcontractor, or (2) exhibit such other evidence as the Contractor may require that charges for all labor and material have been paid. The Contractor reserves the right to check with Subcontractor's suppliers and subcontractors, direct or indirect, to determine the current status of indebtedness and may at its discretion make checks payable jointly to Subcontractor and the supplier or subcontractor or directly to the supplier or subcontractor for the account of the Subcontractor.

(c) Payment by the Contractor to the Subcontractor or for its account shall not be deemed to be an admission or approval by the Contractor of the sufficiency of the work covered by the payment.

(d) Notwithstanding any other provisions of this Agreement, Contractor shall be under no obligation to make any payment to the Subcontractor under any provision hereof except to the extent that Contractor has received funds from Owner, payment by Owner being a condition precedent to payment of the Subcontractor.

(e) Contractor may apply any payments otherwise due Subcontractor hereunder to any other indebtedness, liability or obligation of Subcontractor to Contractor whether under this Agreement or any other agreement or circumstance.

## ARTICLE 6. EXTRAS AND OMISSIONS—

a) In the event that the Contractor directs Subcontractor to perform extra or additional work, Subcontractor agrees that it will promptly perform and diligently complete such work whether or not Contractor and Subcontractor have agreed on the cost of such work. Subcontractor shall submit to Contractor a lump sum proposal for such work, which proposal shall include a detailed cost breakdown for each component of the work, indicating both quantities and unit prices, and such proposal shall be submitted to Contractor not later than 10 days after such proposal is requested by Contractor. If a lump sum price or unit price for the extra work cannot be agreed upon, Subcontractor agrees to do the work on the basis of its actual cost plus percentage fees for overhead and profit as set forth in Article 10. The Contractor shall not be liable for payment for any extra work performed by the Subcontractor unless such work is first expressly authorized by the Contractor in writing.

(b) In the event that the Subcontractor performs any such authorized extra work on an actual cost plus basis, it shall furnish each day to the representative of the Contractor, duplicate payroll sheets, timesheets, material tickets, and a statement or slips for all other charges, retaining a copy of each thereof, and securing on each thereof the signature of the duly accredited representative of the Contractor; such signed copies of payroll sheets, timesheets, material tickets, statements and slips shall accompany all bills and vouchers presented with application for payment.

(c) Should the Contractor during the execution of this Contract require the Subcontractor to omit any work embraced within the terms of this Contract, said omission being for the account of the Owner, the Contractor, or any other subcontractor on the work, the Subcontractor agrees to omit such work, and the Contractor will deduct from any monies due the Subcontractor the actual amount agreed upon for said omitted work.

(d) In the event of any dispute, controversy, or claim for additional compensation or time extensions, notice in writing shall be given to the Contractor no later than seven (7) days following the occurrence on which claim is based. Such notice shall describe the dispute, controversy or claim in detail so as to allow Contractor to review its merits. Any claim not presented within such time period shall be deemed waived by Subcontractor. Promptly thereafter, Subcontractor shall provide detailed information to substantiate such claim including supporting documentation and calculations, and including any information requested by Contractor.

(e) If the Subcontractor shall make any claim against the Contractor for extra work or additional compensation for which the Owner or its agents may be liable, the Contractor may present such claim or claims to the Architect and/or Owner for determination and decision provided (1) such claim is not, in the judgment of the Contractor, made in bad faith, (2) Subcontractor has given notice as set forth above and in the form required by the General Contract, and has presented the claim to Contractor in sufficient time for Contractor to review the claim in advance and present it to the Owner within the time required by the General Contract, and, (3) Subcontractor has both requested in writing that Contractor present the claim and has agreed in writing, on terms satisfactory to Contractor, to pay all costs of Contractor in presenting and pursuing such claim. Presentation of the claim by Contractor shall not be construed as an acknowledgment of the validity thereof, or a waiver of any right of the Contractor, and such action shall be without prejudice to its rights. The decision of the Architect and/or Owner shall be final and binding upon the Subcontractor to the same extent and purpose that it is final and binding on the Contractor.

(f) No extras will be allowed for difficulties or inconveniences arising from mud, dust, water, ice, snow, wind, heat or cold or similar natural or physical conditions. Contractor assumes no responsibility for material received, unloaded or stored for or by Subcontractor. Materials, tools, supplies, equipment, etc., belonging to or leased to Subcontractor are its responsibility and no claim for missing or stolen property will be allowed. Contractor shall not be required to provide hoisting facilities or temporary power, water or heat unless otherwise provided herein.

(g) In the event Contractor directs Subcontractor to work overtime or premium time for which Contractor is obligated hereunder to reimburse the Subcontractor, Subcontractor agrees to perform such work and shall be reimbursed only for the difference between regular time and overtime for direct payroll cost and the related payroll taxes, insurance, and benefits, and shall not be entitled to any additional compensation for overhead or profit or for inefficiencies or declines in productivity. Nothing herein shall be construed to obligate Contractor to pay for any overtime work it has not approved in writing, or for any overtime work caused by failure of Subcontractor to provide sufficient manpower or otherwise maintain the progress of the Work.

## ARTICLE 7. DEFAULT—

(a) In the event the Subcontractor shall, in the judgment of the Contractor, (1) become insolvent, or file or have filed against it any petition in bankruptcy, make an assignment for the benefit of creditors, or commence or have commenced against it or enter into any other proceeding or arrangement for relief of debtors, reorganization or deferral or discharge of debts, (2) fail to pay, when due, for materials, supplies, labor, or other items purchased or used in connection with the work, (3) fail to pursue the work in accordance with this Subcontract and the schedules established by the Contractor, (4) fail to supply a sufficiency of properly skilled supervisors, workmen, or of materials, tools, equipment, or supplies of the proper quality (including failure occasioned by a strike, picketing, boycott, or other cessation of work by Subcontractor's employees), (5) interfere with or disrupt, or threaten to interfere with or disrupt the operations of the Contractor, the Owner, or any other laborer, materialmen, supplier, subcontractor, or other person working on the job, whether by reason of any labor dispute, picketing, boycotting, or by any other reason, or (6) commit any other breach of this Subcontract, then any such event shall immediately with no further action or notice required on the part of the Contractor, constitute a default by the Subcontractor under this Subcontract, and any such event shall be deemed to be a breach of this Subcontract. The Contractor will give the Subcontractor written notice of default. Upon receipt of such notice, Subcontractor shall have two (2) days in which to cure any such default provided, however, that if, in the judgment of the Contractor, such default cannot be cured within a two (2) day period after such notice, the Contractor will notify the Subcontractor of default but the Subcontractor will not have any right to cure such default. In the event of a default for which there is no right to cure as provided hereinabove, or in the event of the expiration of the 2-day cure period set forth hereinabove without all such defaults having been fully cured, the Contractor

Initialed by:
Contractor: _____  Subcontractor: _____

THE WHITING-TURNER CONTRACTING COMPANY

may terminate this Subcontract, take possession of all or any materials, supplies, equipment and tools pertaining to this job whether on the job site, in the Subcontractor's shop or in transit, and may make independent arrangements for completion of the job. The amount of completion cost, as well as any other costs, damages, or expenses, including Contractor's legal fees and expense, incurred as a result of such default shall be charged against any unpaid balance due to the Subcontractor under this Agreement or under any other agreement between Contractor and Subcontractor; and, if said total costs, damages or expenses shall exceed the balance due, the Subcontractor agrees to pay the amount of said excess upon demand of the Contractor. The materials, supplies, equipment and tools taken by the Contractor may be used in completing the job and may be incorporated into the improvements being constructed. With respect to any of such items incorporated into the Project, or consumed in the job, the net reasonable value of the same as of the date of taking shall be taken into account in the calculation of the aforesaid total completion costs, damages, and expenses. With respect to any such items which are not so incorporated or consumed, or which have a salvage value, the Contractor may, at its option (1) assume title to the same or any part of the same, as of the date of default and take into account the net reasonable value thereof as of the date of taking in the calculation of the total completion cost, damages, and expenses or (2) return the same to Subcontractor and take into account the net reasonable value of the use thereof by Contractor in the calculation of the said total completion cost, damages, and expenses. As used in the preceding sentences, the phrase "net reasonable value" of any items shall mean the reasonable value after deducting all amounts which have been paid to the Subcontractor on account thereof.

(b) In addition to, and not in substitution of, the remedies herein above specified, Contractor may immediately, in the event of default or failure of Subcontractor to perform its obligations hereunder, provide or arrange for the provision of such workmen and materials necessary to continue and complete the work contracted for hereunder for the account of the Subcontractor and at Subcontractor's cost and expense, and apply any and all funds due or to become due to Subcontractor thereto, all without terminating, rescinding or voiding this Subcontract or releasing the Subcontractor from any liability hereunder or from any damages caused by Subcontractor's failure to perform.

(c) In the event of a default by the Subcontractor under this Subcontract, all sums and obligations owing to the Contractor by the Subcontractor in any right or capacity, whether under this Subcontract or otherwise, immediately shall become due and payable to the Contractor.

(d) In the event the Contractor does not terminate this Subcontract, but assents to delayed completion of the work by the Subcontractor, such assent shall not be construed as a waiver of the Subcontractor's obligation to reimburse the Contractor for any costs, damages, or expenses incurred as a result of such delay; and all such costs, damages, and expenses shall be paid or reimbursed to Contractor upon demand.

(e) In the event that Contractor wrongfully exercises any of its rights under this Article 7, Subcontractor's sole and exclusive remedy shall be payment of the Subcontract Amount for the portion of the Subcontract performed by Subcontractor.

ARTICLE 8. WAIVER OF LIENS--

(a) To the extent permitted by applicable laws, Subcontractor hereby expressly waives and releases any and all liens and lien rights against the property of the Owner and/or the Contractor to which it or they are or may be entitled under any act, statute, ordinance, or other provision of law or equity.

(b) Subcontractor agrees to execute such specific releases and/or waivers of liens and lien rights as may be requested by Contractor. Subcontractor shall promptly apply all payments made hereunder to Subcontractor's cost for labor and materials for the Project and shall further take any and all necessary actions to keep the Project free and clear of all claims for liens. In the event that any person furnishing labor or materials to the Subcontractor files a notice of intent to place a lien on the Project, Subcontractor shall promptly take all necessary steps to have such notice withdrawn, including, if requested by Contractor, the posting of a bond. In the event that Subcontractor does not fulfill its obligations under this Article 8, Contractor may take all actions which it deems reasonable or necessary to protect the Project from liens and the costs of any such actions including attorney's fees, shall be deducted from amounts payable by Contractor to Subcontractor under this Agreement or any other agreement or circumstance. Subcontractor shall remain liable in the event that monies payable to it are insufficient to pay any damages or expenses arising from such liens.

ARTICLE 9. MISCELLANEOUS--

(a) The Subcontractor shall not sublet, assign or transfer this Contract or any part thereof, or the money due or to become due under it, without the written consent of Contractor; and any assignment or transfer without such consent shall be void.

(b) Subcontractor's bid or proposal was accepted, and this Subcontract was awarded, on the condition that this form of Subcontract would be executed, without change or alteration, by Subcontractor and on the condition that Subcontractor would commence performance of the work on the date established by Contractor. Commencement of performance of the work described herein shall constitute Subcontractor's agreement to each and every term hereof irrespective of whether this Subcontract is executed by Subcontractor.

(c) The Subcontractor shall not cause any unnecessary hindrance or delay to the Contractor or to other subcontractors on said Project and shall repair promptly and be responsible for all damage done to the work of the Contractor or other subcontractors by Subcontractor, its agents, employees, subcontractors, or suppliers. Subcontractor shall be directly responsible to the Contractor or other subcontractors whose work is so damaged. The Contractor shall be responsible to the Subcontractor for physical damage to Subcontractor's work only if such damage is directly and proximately caused by the sole negligence of the Contractor.

(d) The Subcontractor also agrees to clean up daily and remove dirt, trash and debris which may result from its employees and the work done hereunder from the job site, as directed by the Contractor. In the event the Subcontractor fails to clean up and remove such dirt, trash and debris, the Contractor may, at its discretion, arrange for the same at Subcontractor's expense.

(e) The Subcontractor agrees to indemnify and hold harmless the Contractor and/or Owner, their officers, directors, agents and employees, from and against any and all claims, suits, liens, judgments, damages, losses and expenses, including, but not limited to, attorney's fees, arising in whole or in part and in any manner from the acts or omissions of the Subcontractor, its officers, directors, agents, employees or subcontractors, in the performance of this Contract. The Subcontractor shall defend and bear all costs of defending any actions or proceedings brought against the Contractor and/or Owner, their officers, directors, agents and employees, arising in whole or in part out of any such acts or omissions, provided, however, that the Contractor and/or Owner shall have the right to approve counsel to conduct such defense.

(f) Subcontractor acknowledges that, before executing this Agreement, it has carefully examined this Agreement, the Contract Documents and the Project site, has made such investigation of the Work required to be done and the material required to be furnished and, based upon such examination and investigation, Subcontractor represents that it fully understands and can perform all requirements of the Contract Documents.

(g) With regard to the subject matter of this Subcontract: (1) Subcontractor shall have no greater or different rights and/or remedies against Contractor with respect to any matter (including, but not limited to, omissions, alterations, extra work and additional compensation) than Contractor has against Owner pursuant to the Contract Documents; (2) Subcontractor assumes all obligations, duties and responsibilities by which Contractor is bound to Owner pursuant to the Contract Documents; (3) Subcontractor shall be bound to Contractor to the same extent that Contractor is bound to Owner by all of the terms, provisions and conditions set forth in the Contract Documents; and (4) Owner shall have all rights and remedies against Subcontractor that Owner has against Contractor pursuant to the Contract Documents.

C-013
12/05/2000

SC 6

Initialed by:
Contractor: _____ Subcontractor: _____

THE WHITING-TURNER CONTRACTING COMPANY

(h) The Contractor shall have the right at any time to cancel this Contract and require this Subcontractor to cease work thereon in the event the General Contract is cancelled or terminated in accordance with its terms or by reason of the default of the Owner. The Subcontractor, in such event, shall be entitled to further payment only as provided in Article 5. The Subcontractor agrees to be bound by any and all provisions in the General Contract respecting renegotiation as well as cancellation or termination.

(i) Subcontractor agrees to clearly note on each payment check to, and related invoice of, its subcontractors and material suppliers which exceed One Thousand Dollars ($1,000.00), as being for work or materials provided pursuant to this Agreement for this Project, by name, all to be subject to Contractor's inspection upon request. Subcontractor also agrees to submit promptly to Contractor, upon request, the name, address and telephone number of each subcontractor or supplier of any tier, to Subcontractor for labor, materials, or equipment used on this Project.

(j) The Subcontractor warrants its workmanship and materials furnished against any defects, faults or damages arising therefrom during the period of construction and for a period of one year from the date of final completion of the Project (or for such longer period of time as may be required herein or by the Contract Documents). The Subcontractor shall remedy such defective workmanship, material, or damages at the request of the Contractor, at times convenient to the Owner, and to the satisfaction of Owner, Architect and Contractor.

(k) It is further understood and agreed that all work performed under this Contract shall be in strict conformity with applicable laws, codes, ordinances, rules, regulations and requirements of Federal, State, County and Municipal authorities and of the National Board of Fire Underwriters and any local fire Underwriters and any local fire insurance exchange now or hereafter in effect. In the event of any discrepancy between the present requirements of such laws or authorities and the provisions of this Subcontract, the former shall govern, and the Subcontractor shall perform the work as required thereby at no extra cost. Should the Subcontractor incur additional costs because of any future change in such requirements, additional compensation therefor will be conditioned upon approval of the Architect and Owner. If the Subcontractor performs any work contrary to such laws, codes, ordinances, rules, regulations or requirements, it shall bear all costs arising or resulting therefrom.

(l) Subcontractor shall be represented on the job site during the course of its work by qualified, full-time supervisors acceptable to Contractor. Subcontractor shall enforce discipline and good order among its employees, suppliers, and subcontractors engaged in the work. Contractor may require Subcontractor to remove from the project any such employees, suppliers, or subcontractors or others employed on the work that Contractor may deem incompetent, improper, or a hindrance to progress of any work on the Project, whereupon any such employee, supplier, or subcontractor shall be so removed and shall not again be employed on any part of the work without written consent of the Contractor.

(m) The Contractor shall have the right to require at any or all progress meetings, whether called by the Owner, the Contractor, or others, the presence of a representative of the Subcontractor authorized to act in its behalf.

(n) The Subcontractor agrees that it will not engage in discriminatory employment practices in violation of any Federal, State, or local law including any order or regulation of any agency authorized to enforce any such law. To the extent applicable, the Subcontractor agrees to comply with Title VII of the Civil Rights Act of 1964, Executive Order 11246, and all additional orders, regulations, amendments, etc., pertaining thereto, including certification of nonsegregated facilities. The Subcontractor agrees to furnish such additional information, certifications, and policies as may be required by the Contract Documents.

(o) The Subcontractor agrees to comply with all applicable rules, regulations and relevant orders of the Secretary of Labor issued pursuant to the Rehabilitation Act of 1973, the Vietnam Era Veterans Readjustment Assistance Act of 1974, and the Americans With Disabilities Act of 1990.

(p) Subcontractor shall comply with all applicable federal, state and local laws, regulations and orders relating to occupational safety and health, and related procedures established by Contractor and shall, to the extent permitted by law, indemnify and hold Contractor and Owner, their directors, officers, agents and employees, harmless from any and all liability, public or private, penalties, contractual or otherwise, losses, damages, costs, attorney's fees, expenses, causes of action, claims or judgments resulting from a claim filed by anyone in connection with the aforementioned acts, or any rule, regulation or order promulgated thereunder, arising out of this Agreement or any subcontract hereunder. Subcontractor further agrees in the event of a claim of violation of any such laws, regulations, orders or procedures arising out of or in any way connected with the performance of this Agreement, Contractor may immediately take whatever action is deemed necessary by Contractor to remedy the claim of violation. Any and all costs or expenses paid or incurred by Contractor in taking such action shall be borne by Subcontractor, and may be deducted by Contractor from any payments due Subcontractor. The Subcontractor agrees to (1) comply with all safety rules and regulations and work practices and procedures established by the Contractor and/or the Owner; (2) take all necessary steps to promote safety and health on the job site; (3) cooperate with Contractor and other contractors in preventing and eliminating safety and health hazards; (4) train, instruct and provide adequate supervision to assure that its employees are aware of, and comply with, applicable Federal and State safety and health laws, standards, regulations and rules, safe and healthful work practices and all applicable safety rules, regulations, and work practices and procedures of the Contractor; (5) not create any hazards or expose any of its employees, employees of the Contractor or employees of contractors to any hazards; (6) immediately abate all hazards within its control regardless of whether it created such hazard; and (7) where the Subcontractor is aware of the existence of a hazard not within its control, notify the Contractor of the hazard as well as warn exposed persons to avoid the hazard. Subcontractor shall notify Contractor of any personal injury requiring medical treatment of any of Subcontractor's employees or others at the Project site, or of significant damage to property arising in connection with Subcontractor's performance, as promptly as possible after the occurrence of such injury or damage. Within forty-eight (48) hours of such occurrence, Subcontractor shall furnish to Contractor a complete written report of such injury or damage.

(q) In the event of variations, conflicts, ambiguities or inconsistencies between or among the terms, provisions or conditions of this Subcontract and any other Contract Documents, the terms, provisions and conditions which grant greater rights or remedies to Contractor or impose higher standards with regard to the obligations, responsibilities and scope of work of the Subcontractor shall control. Notwithstanding any other provisions of this Subcontract or of the Contract Documents, disputes hereunder shall not be resolved by arbitration unless Contractor agrees in writing to arbitration of such specific dispute. In the event that arbitration is provided in the Owner-Contractor Agreement for disputes between Owner and Contractor, Subcontractor agrees, upon request of Contractor, to submit any related disputes as determined by Contractor in its sole discretion, to arbitration and consolidation of said disputes with any arbitration or administrative proceedings between Contractor and Owner or any other party.

(r) The Subcontractor agrees to provide and furnish prior to commencing work, certificates in duplicate of insurance covering its work under this Contract for Workmen's Compensation, General Liability Insurance to include Bodily Injury and Property Damage Insurance, and other insurance with limits and coverages as set forth in the Contract Documents or in Exhibit A attached hereto, whichever is greater. All policies of insurance shall be in "occurrence" form and with companies and in amounts acceptable to the Contractor, and shall not be subject to modifications or cancellation during the terms of the work hereunder without thirty (30) days prior written notice to the Contractor by certified or registered mail. Subcontractor will not change or terminate said policies without the written consent of the Contractor. The Subcontractor accepts exclusive liability for contribution tax or premiums for Unemployment Compensation, Social Security, Withholding Tax and Workmen's Compensation.

C-013
12/05/2000

SC 7



Initialed by:
Contractor: ___  Subcontractor: RAM

THE WHITING-TURNER CONTRACTING COMPANY

(s) The Subcontractor agrees to furnish a bond guaranteeing its performance of this Subcontract, if so requested by the Contractor, in amount and form and with such surety as are acceptable to the Contractor. The cost of the bond shall be paid by the Subcontractor

(t) The Subcontractor furthermore understands and agrees that it shall not deal directly with representatives of the Owner, but shall handle all matters connected with this Contract, the work, or the furnishing of the materials or payment therefor, exclusively through the Contractor, unless otherwise directed in writing by the Contractor.

(u) This Subcontract shall be governed by the laws of the State of Maryland, without regard to principles of conflict of laws. Any action or suit arising hereunder shall be brought in the jurisdiction where Contractor's principal office is located without regard to principles of conflict of laws or forum non conveniens. In the event of litigation between them, Contractor and Subcontractor waive trial by jury. If requested by Contractor, Subcontractor agrees to submit any dispute under this Subcontract to arbitration under the Construction Industry Rules of the American Arbitration Association.

ARTICLE 10. SUBCONTRACT AMOUNT--The Contractor agrees to pay the Subcontractor for the performance of its work hereunder the following sum or sums, which shall unless otherwise specified, include all taxes, insurance premiums, charges for permits and all other fees and charges, and shall be firm and binding on the Subcontractor for the work and not conditioned upon a firm completion date or on any labor increases or material escalation costs which might occur during the course of construction:  Eight Million, Five Hundred Eighty Four Thousand Two Hundred Dollars and no cents ($8,584,200.00)

Percentage fees for overhead and profit for extra work, subject to the provisions of Article 6 hereof, shall be: _____**% for work performed by Subcontractor's own forces and _____**% for work performed by their contractors and suppliers. Sub-subcontractor shall likewise be entitled to _____**% for work performed by their own forces and _____**% for work performed by their contractors and suppliers. No fee will be allowed on overtime premiums. Such percentages include all office overhead and supervision above the foreman level.
    ** - Per District of Columbia Standard Specifications
ARTICLE 11. The following additions, deletions, and/or corrections to the above printed conditions are hereby acknowledged by both parties to form a part of this Contract:

    ARTICLE 7, (a) – Lines 16 and 21, remove the phrase *"equipment and tools"*.
    ARTICLE 7, (c) – Remove this paragraph in its entirety.
    ARTICLE 5, (a) – Line 3, replace *"ninety percent (90%)"* with *"a percentage"*.
        Line 5, after sentence ending with the word "regulation" insert a sentence which reads *"The percentage paid to the Subcontractor for the value of the work performed will be established by the Owner's percentage paid to Whiting-Turner for the value of same."*

        Exhibit A – Insurance Requirements
        Exhibit B – General Scope Requirements
        Exhibit C – WT Non-OSHA Safety Rules
        Exhibit D – Contract Documents
        Exhibit E – Basis of Payment
        Exhibit F – Toxic/Hazardous Substances
        Exhibit G –

ARTICLE 12. CONTRACT ALTERATIONS AND OMISSIONS--In the event any changes to this Subcontract form, including alterations and omissions noted thereon, are inconsistent with the requirements of the second sentence of Article 3(a), those requirements shall prevail in all respects.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

SUBCONTRACTOR:                                CONTRACTOR:

Fischbach & Moore Electric, Inc.              THE WHITING-TURNER CONTRACTING COMPANY

BY: _____                   BY: _____
        SIGNATURE                                     SIGNATURE

Richard R. Manville, President                Calvin D. Disney
PRINTED NAME AND TITLE                        PRINTED NAME AND TITLE

DATE: March 18, 2003                          DATE: March 24, 2003

WITNESS: _____               WITNESS: _____

C-013
12/05/2000                          SC 8              Initialed by:
                                                      Contractor: ___  Subcontractor: ___

THE WHITING-TURNER CONTRACTING COMPANY

## EXHIBIT A

## INSURANCE

Subcontractor shall, at all times, maintain and keep in force during the term of this Agreement insurance in the forms and with limits to satisfy both the requirements listed on this Exhibit A and those specified by other contract Documents.

### GENERAL INSURANCE REQUIREMENTS

All insurance policies must be from insurers authorized to conduct business within the state(s) where the project is located. The insurance companies must also have a Best's Rating of at least "A-" and a financial size of "Class VII" or better in the latest edition of Best's Insurance Reports.

### WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE

This insurance will pay the subcontractor's obligations under appropriate worker's compensation statutes, including federal benefits under the U.S. Longshore and Harbor Workers Compensation Act. Any deductible under this policy must be disclosed and will be fully assumed by the subcontractor.
Employers liability coverage shall provide limits of at least $500,000 each accident for bodily injury and $500,000 each employee for disease. The policy limit for disease shall be at least $500,000.

### COMMERCIAL GENERAL LIABILITY INSURANCE

This insurance must be written on an "occurrence" basis, responding to claims arising out of occurrences which take place during
the policy period. The commercial general liability form should provide limits of at least the following:

$1,000,000 each occurrence for bodily injury and property damage
$1,000,000 each incident for personal and advertising injury
$2,000,000 products-completed operations aggregate
$2,000,000 general aggregate

The general aggregate limit is to apply separately to each project. The products and completed operations coverage is to be maintained for a period of at least two years following the completion of the work. The Whiting-Turner Contracting Company is to be included as an additional insured.
The contractual liability coverage shall include protection for the subcontractor from claims arising out of the liability assumed under the indemnification provisions of this Agreement. There should be no separate exclusion for property damage liability arising out of explosion, collapse and underground hazards (XCU). Any deductible under this policy must be disclosed and will be fully assumed by the subcontractor.

### BUSINESS AUTOMOBILE LIABILITY INSURANCE

This insurance should apply to any auto, including all owned, hired and non-owned vehicles, to a combined single limit of at least $1,000,000 each accident. For those subcontractors subject to the Motor Carrier Act of 1980, the Motor Carrier Act endorsement # MCS-90 should be attached to the policy, to a primary limit of at least $1,000,000 each accident.
Any statutorily required "No-Fault" benefits and uninsured/underinsured motorists coverage should be included. Any deductible under this policy must be disclosed and will be fully assumed by the subcontractor.

### UMBRELLA EXCESS LIABILITY INSURANCE

This insurance must provide coverage in excess of the limits of employers liability, commercial general liability and business automobile liability. The policy should provide for a limit of at least $5,000,000 each occurrence and include coverage as broad as the primary insurance.

### CERTIFICATES OF INSURANCE

Subcontractor shall provide The Whiting-Turner Contracting Company with certificates of insurance evidencing the required insurance coverage before the subcontractor's work under this agreement is begun.
All Insurance policies shall be endorsed to provide at least 60 days prior written notice of cancellation and non-renewal to The Whiting-Turner Contracting Company. All required certificates of insurance shall eliminate the wording "endeavor to" and "but failure to mail such notice shall impose no obligation of liability of any kind upon the company, its agents or representatives" from the cancellation provision.
Whiting-Turner, the Owner and other entities as may be reasonably requested shall be named as an additional insured under these policies of insurance. It is expressly agreed and understood by and between Subcontractors and Whiting-Turner that the insurance afforded the additional insureds shall be the primary insurance and that any other insurance carried by Whiting-Turner shall be excess of all other insurance carried by the Subcontractor and shall not contribute with the Subcontractor's insurance. Subcontractor further agrees to provide endorsements on its insurance policies which shall state the foregoing; however, Subcontractor's failure to provide such endorsements shall not affect Subcontractor's agreement hereunder.

Initialed by:

Contractor: _(signature)_

Subcontractor: _(signature)_

C-013
12/05/2000                                              SC 9

## EXHIBIT B

**Rehabilitation of the Bryant Street Pumping Station**

## GENERAL SCOPE REQUIREMENTS

Page 1 of 3

The scope of work shall include General Conditions, General Requirements and the following items as they apply to the work in each subcontract/purchase order unless specifically noted otherwise in the specific scope requirements.

1. Subcontractor to provide survey/layout required to perform their work from control points established by WT.
2. Core drilling, cutting, and patching as required to perform work. Include restoration of surfaces to original condition if required.
3. Sealants, caulking and firestopping integral with work.
4. Permit fees, licenses, testing and inspection required for work other than the building permit. Testing for soil compaction, structural steel and concrete will be performed by a separate testing agency. Subcontractor shall coordinate and cooperate with the testing agency and provide assistance as specified.
5. Daily and final cleanup including mud and dirt tracked onto public walks, lots and roads by this contractor is mandatory and will be enforced. Good housekeeping is essential to the safe and efficient construction of the job and is the responsibility of each foreman and his crew. Work areas, stairways, walkways, storage rooms, and other areas shall be kept clean of obstructions, paper, scrap, pipe, lumber, welding rods, rags, and other debris at all times. If, in ~~Whiting-Turner's opinion,~~ subcontractor fails to adequately perform his cleanup duties Whiting-Turner may, at its option, hire labor to perform cleanup and backcharge the subcontractor not performing his share for the cost of such labor.
6. Unloading, Hoisting, and maintenance of traffic for work associated with this contract.
7. Major deliveries shall be coordinated with the Contractor at least 48 hours prior to arrival on the site.
8. Owner, W-T Non-OSHA, OSHA & MOSHA safety requirements. (see attached W-T Non-OSHA rules).
9. Temporary lighting, power & water as required for work beyond that provided by mechanical and electrical subcontractors per specifications. Temporary lighting, power, and water will be provided once the permanent supply and distribution system has been installed. Until such time, the Subcontractor is responsible for temporary measures required to perform their work.
10. Scaffolding, lifts, cranes and other means of access for own work.
11. Temporary staging, storage, office facilities including utilities for same.
12. Premium costs for shutdowns or any other off hour work. All shutdowns must be scheduled at least one (1) week in advance.
13. Phasing and remobilizations per the project schedule and as required to properly coordinate and complete the work.
14. Subcontractors responsible for the procurement of long lead items are required to submit and regularly update a Material Expediting List showing item, manufacturer, sales representative and factory representative (including phone numbers), lead time, required shop drawing submittal and approval dates, manufacturer order/job numbers, etc. as necessary for the Contractor to monitor the progress of these items.
15. Temporary protection of new and existing work from damage by own work.
16. Field measurements and verification of existing conditions.
17. Temporary weather and dust protections for own work.
18. ~~Compliance with local noise restrictions.~~
19. MSDS sheets for all materials must be submitted with the submittals and prior to start of work.
20. Shop drawings, submittals and mock-ups as specified
21. Warrantees as specified commencing on date of substantial completion.
22. ~~Engineering calculations/PE certifications as specified~~  Exclude
23. As-built drawings, O&M Manuals, commissioning tests and all other required closeout documentation.
24. Reproduction cost for contract documents and shop drawings.
25. Insurance per W-T standard subcontract and Owner contract.
26. All applicable sales, use & excise taxes.
27. Sleeves, inserts, and anchors for this work.
28. Additional reinforcement/supports for this work which is not detailed on the architectural and structural drawings, but is required per industry standards.
29. Abide by all directions of the Fire Department in matters affecting life safety and fire prevention measures.

Initialed by:

Whiting-Turner_____

Subcontractor_____

Rev. 5/99

EXHIBIT B

Rehabilitation of the Bryant Street Pumping Station

## GENERAL SCOPE REQUIREMENTS

Page 2 of 3

30. Cooperate fully with all Inspection Agencies and architects/engineers.

31. Temporary barricades shall be placed in accordance with OSHA standards and maintained by the subcontractor creating the hazard, or when necessary to facilitate the next sequence of construction. The subcontractor responsible for the next sequence of construction is then responsible for the barricades if a hazard still exists. Subcontractors who disturb barricades shall restore them to meet safety requirements, at their own expense. The foregoing "barricades" applies equally to all safety, weather and dust protection provisions. Whiting-Turner shall have the right to determine the suitability of barricades.

32. Normal working hours for this project shall be 7:00AM to 3:30PM: (Working other hours will require authorization by WT).

33. Special provisions to minimize disruption to existing facilities operations (if applicable).

    a.    Any work that will disrupt facilities operations generally must be performed during off hours; this includes:

        1.    All utility outages

        2.    Operations disrupting access/egress at entrances.

        3.    Operations creating a safety hazard to the public.

    b.    Arrangements must be made with Project Superintendent 24 hours in advance of WT notice to Owner for access to work within existing facilities that may disrupt station operations or occupied areas.

    c.    Access to existing facilities must be maintained at all times. Provide necessary temporary measures and/or phase work to insure access requirements are maintained.

    d.    Coordinate and phase sitework to maintain traffic into and around the site and to provide for maximum parking capacity during construction per owner requirements.

    e.    Availability of space within the site for storage of material/equipment will be limited. All Subcontractors must closely coordinate deliveries as required.

34. Full-time competent on-site supervision is required by all Subcontractors during performance of own work. In the case of contracts involving Second Tier Subcontractors, the Primary Subcontractor will provide on-site supervision and coordination of their subcontractors and direct hire work. The contractor will be backcharged for time spent performing such coordination by Whiting-Turner if it does not exist.

35. Submit daily work reports indicating number of workers by classification, work completed, and hours worked.

36. Use of site for staging, storage trailers, parking, smoking, lunch, etc. shall be as instructed and approved by W-T.

37. Attendance of progress meetings by the supervisor or foreman is mandatory.

38. Subcontractor shall designate an on-site safety representative and hold weekly safety meetings for all of their employees. Meeting minutes from these meetings are to be turned into the WT Superintendent.

39. Subcontractor shall submit pricing for changes within five (5) days of receipt of approved change unless mutually agreed otherwise. All pricing must be accompanied by a detailed breakdown of the costs. Non-response within the required time frame will be considered as the Subcontractor's agreement to accept Whiting-Turner's assigned value for the change.

40. Tickets for extra work will not be considered unless signed by an authorized W-T representative and backed up by a written summary of all associated costs within five (5) days of the performance of such work.

41. Construction personnel shall use designated entrance and egress areas to the project as directed by Whiting-Turner.

Initialed by:

Whiting-Turner _____

Subcontractor _____

Rev. 5/99

EXHIBIT B

Rehabilitation of the Bryant Street Pumping Station

## GENERAL SCOPE REQUIREMENTS

Page 3 of 3

## Schedule

1.  The proposed schedule for this project is outlined on Attachment_____. It is understood that the schedule is of the essence on this project and each subcontractor is responsible for completion of its work in coordination with the work of all other subcontractors within the required sequence and time frame so that the established schedule is met.

2.  The proposed schedule includes "estimated" start dates for the construction activities. In the interest of the overall project, W-T reserves the right to alter the sequencing of activities in order to accommodate project conditions and/or Owner requirements. It is understood that the subcontractor shall be obligated to complete its activities within the specified duration regardless of the actual start date. See below

3.  All shop drawings and submittals must be submitted within sufficient time to ensure delivery of all materials and equipment to meet the established schedule, or within the dates indicated on Attachment , whichever occurs first. The subcontractor shall allow a minimum of three (3) weeks for review of submittals and shop drawings.

4.  The proposed schedule durations include anticipated impacts due to normal weather. It is agreed that weekends shall be used as makeup days for time lost during the week due to weather as necessary to maintain the schedule.

5.  All work, or applicable portions of the work, shall be sufficiently complete as required for Owner's fit-out, use and occupancy and all required approvals and permits for use and occupancy shall have been issued by the appropriate authorities by the established "Date of Substantial Completion" of the work, or applicable portion thereof.

6.  All punchlist work and project closeout documentation shall be completed and approved by the Owner and Architect by the "Date of Final Completion" which shall be no later than 14 days after the Date of Substantial Completion where reasonable. Any uncompleted punchlist items after this date will be completed by Whiting-Turner and backcharged to the appropriate subcontractor or vendor. Final invoices will not be processed until final completion of the work and certification of same by WT, the Owner and Architect.

7.  (If applicable) It is understood that the existing facility will be fully operational throughout the performance of this work and all subcontractors must exercise special care and make special provisions to maintain safe access/ egress and to minimize disruption of the facilities' operation.

2.1 – Any revisions to the construction schedule must be mutually agreed upon by Fischbach & Moore Electric.

Initialed by:
Whiting-Turner_____
Subcontractor_____

- SC 9.3-

EXHIBIT C

Rehabilitation of the Bryant Street Pumping Station

## WT NON-OSHA SAFETY RULES & REGULATIONS

**CONTAINERS**

No glass containers allowed on site.

**CRANES**

A.    All lifts must use tag lines.
B.    No open hooks used on lifts.
C.    Boom should be in down position when not in use.

**EQUIPMENT**

A.    Absolutely no riding on equipment not equipped with proper seating.
B.    Site speed not to exceed 10 MPH.
C.    All buckets and blades should be left resting on ground with the hydraulic pressure released when not in use.

**FIRE CONTROL**

A.    No open fires, fire barrels, or hot boxes.
B.    Fire extinguishers in:

| Trailers/Office | - | minimum 10 lb. ABC |
| Equipment | - | minimum 5 lb. ABC |
| Fire Watch | - | minimum 20 lb. ABC |

C.    Be aware of job site locations.

**HARD HATS**

A.    Wear on site at all time, must have Z89.1 rating.
B.    No metal hard hats or bump caps authorized.

**FOOT PROTECTION**

A.    Substantial leather boots required.
B.    Loafers, sandals, tennis shoes (including steel toe type) are not allowed.

**LADDERS**

A.    No metal ladders on site.
B.    Damaged ladders must be immediately removed from site or destroyed.

**SCAFFOLDING**

Full handrails, mid-rails, end rails that should withstand 200 lbs. in any direction, toe boards, and full decking required on all scaffolds regardless of height.  Safe access should be provided by ladders or stairs.

Initialed by:
Whiting-Turner
Subcontractor

- SC 10.1-

Rev. 5/99

<u>EXHIBIT C</u>

Rehabilitation of the Bryant Street Pumping Station

WT NON-OSHA SAFETY RULES & REGULATIONS

Page 2 of 2

## SIGNAGE
    A.    Post safety or hazard signs (bilingual if necessary).
    B.    Use Whiting-Turner supplied (Do Not Remove) signs on floor openings.

## TRUCKS
    A.    No more than three (3) persons in cab of truck.
    B.    No riding in back of truck unless truck is equipped with seats and safety belts.

## WORK CLOTHING
    A.    All shirts must have a minimum four (4) inches sleeve length over shoulders.
    B.    NO shorts, cut-offs, tank tops, net shirts. etc.

## TRENCHES
    A.    Trenches need to be shored or sloped at five (5) feet when there is danger of cave in.
    B.    Trenches at any depth shall be protected by barriers and/or cover plates.
    C.    An entrance ladder is needed at five (5) feet minimum.

## ELECTRIC CORDS
Tool and extension cords should not be frayed or damaged and should be equipped with ground.

## SAFETY FUEL CANS
Should be labeled, in good condition, and equipped with flame arrestor.

## DROPPING MATERIALS
A closed chute is required when dropping materials more than twenty (20) feet.

## HOUSEKEEPING
Shall be performed daily and debris disposed of properly.

## EYE PROTECTION
Safety glasses, goggles, or face shields should be used at all times when using power tools, or hazardous condition exists.

## RADIOS
No boom boxes or headsets on site at any time.

## ACETYLENE TORCHES
    A.    All parts in working condition.
    B.    All bottles off and capped when not in use.
    C.    All bottles secured properly.
    D.    No bottles laid down anywhere at any time.

Initialed by:
Whiting-Turner _____
Subcontractor _____

Rev. 5/99

## EXHIBIT D

### Rehabilitation of the Bryant Street Pumping Station

### CONTRACT DOCUMENTS

Page 1 of 1

| | |
|---|---|
| Contract Drawings: | Pursuant to Special Provisions Article 2 |
| Contract Specifications: | Volumes 1-3 |
| | DC WASA Special Provisions |
| | DC WASA General Requirements |
| | Office Manual Drawings |
| Addendum(s): | 1, 2 |

### SUBMITTALS

Send eight (8) copies and two (2) reproducibles to:   The Whiting-Turner Contracting Company
300 East Joppa Rd.
Baltimore, MD 21286
Attn: Alex Sutherland

Initialed by:
Whiting-Turner
Subcontractor

- SC 11 -

Rev. 5/99

**EXHIBIT E**

Rehabilitation of the Bryant Street Pumping Station

BASIS OF PAYMENT

A.    Invoicing                                                                Page 1 of 1

    1.    After the award of the Subcontract, Whiting-Turner and the Subcontractor will develop an itemized breakdown of the Subcontract Amount duplicating the activities shown in the Project Schedule. This breakdown will be shown on Form WT-002.

        At the end of each pay period, the Subcontractor shall submit to Whiting-Turner, for approval, an Invoice comprised of the following forms:

        A.    Application For Payment (Form WT-001)

        B.    Schedule of Values (Form WT-002)

        C.    Change Order Summary Sheet (Form WT-003)

        This invoice must be received by the twentieth (20th) day of the month, however, "Work Completed" shall be estimated to the twenty-fifth (25th) day of the month. Invoices that are received after the twentieth (20th) of the month will not be payable during the current billing cycle.

B.    Payment

    1.    It is understood by the Subcontractor that Whiting-Turner will not release monthly payment to the Subcontractor until Whiting-Turner receives corresponding payment from the Owner.

C.    Retainage

    1.    Release of final retainage by Whiting-Turner shall be per the terms stated in the Subcontract enclosed herewith.

D.    Releases

    1.    The Subcontractor shall submit the "Subcontractor's Partial Release Waiver of Lien and Affidavit" in exchange for payment (s) from Whiting-Turner.

    2.    The Subcontractor shall submit the "Subcontractor's Final Release and Affidavit" prior to receipt of final payment from Whiting-Turner.

E.    Attachments:

- Application For Payment (Form WT-001)
- Schedule of Values (Form WT-002)
- Change Order Summary Sheet (Form WT-003)
- Subcontractor's Partial Release Waiver of Lien Affidavit
- Subcontractor's Final Release and Affidavit

Initialed by:
Whiting-Turner
Subcontractor

Rev. 5/99

# APPLIC   ON FOR PAYMENT

Subcontractor B____ng to Whiting-Turner

For____ 001.

TO:   THE WHITING-TURNER CONTRACTING COMPANY

FROM:

REMIT TO
ADDRESS:

Contractor

PAGE                OF      PAG

PROJECT:
CONTRACT NO:
APPLICATION NO:
PERIOD TO:

## APPLICATION:

Application is made for Payment, as shown below, in connection with the Contract.
Schedule of Values, WT-002, is attached.

| | |
|---|---|
| 1   ORIGINAL CONTRACT SUM | |
| 2   Net change by Change Orders | $ |
| 3   CONTRACT SUM TO DATE (Line 1 +/- 2) | $ |
| 4   TOTAL COMPLETED & STORED TO DATE | $ |
|    (Column G on WT-002) | |
| 5   RETENTION | |
| a      % of Completed Work | |
|    (Column D + E on WT-002) | $ |
| b      % of Stored Material | |
|    (Column F on WT-002) | $ |
| c      % of Contract Sum | |
| Total Retention (Lines 5a + 5b, or Line 5c) | $ |
| 6   TOTAL EARNED LESS RETENTION | $ |
|    (Line 4 less Line 5 Total) | |
| 7   LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ |
| 8   CURRENT PAYMENT DUE | $ |

## CHANGE ORDER SUMMARY

| | Additions | Deductions | Net Change |
|---|---|---|---|
| Previously Approved | | | |
| Approved this Month (Form WT-003) | | | |
| Totals | | | |

## CERTIFICATION:

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from Whiting-Turner, and that the current payment shown herein is now due.

CONTRACTOR:

By:                                                    Date:

_____
Printed Name and Title

State of:                          County of:
Subscribed and sworn to before me this          day of
Notary Public:
My Commission expires:

## For Whiting-Turner Use Only:

| JOB NO. | SUB JOB NO. | | ITEM NO. | ITEM NO. | CMS CONT. NO. | | ITEM NO. |
|---|---|---|---|---|---|---|---|
| GROSS TO DATE | | | | | | | |
| RETENTION TO DATE | | | | | | | |
| TOTAL DUE TO DATE | | | | | | | |
| LESS PREV. APPL'S | | | | | | | |
| CURRENT PAY | | | | | | | |
| VENDOR | | APPV | DATE | | | VP | |

| JOB NO. | SUB JOB NO. | | ITEM NO. | ITEM NO. | CMS CONT. NO. | | ITEM NO. |
|---|---|---|---|---|---|---|---|
| GROSS TO DATE | | | | | | | |
| RETENTION TO DATE | | | | | | | |
| TOTAL DUE TO DATE | | | | | | | |
| LESS PREV. APPL'S | | | | | | | |
| CURRENT PAY | | | | | | | |
| VENDOR | | APPV | DATE | | | VP | |

8/2001

PAGE OF _____ GES

FROM: _____

PROJECT: _____

APPLICATION NUMBER: _____

DATE: _____

PERIOD TO: _____

**WT-001 APPLICATION FOR PAYMENT**, containing Contractor's signed Certification is attached.

In tabulations below, amounts are stated to the nearest dollar.

| A | B | C | D | E | F | G | | H |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO | DESCRIPTION OF ITEM | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) |
| | | | | | | | | |

# CHANGE ORDER SUMMARY SHEET

WT-003

FROM:

Application Number:
Date:
Period To:
Job No:

PAGE ___ F ___ PAGES

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in previous months. | | |

**Approved this Month**

| Number | Date Approved | | |
|---|---|---|---|
| | | | |

| | TOTALS | |
|---|---|---|
| Net Change by Change Orders | | |

A-003
1/93

# SUBCONTRACTOR'S PARTIAL RELEASE WAIVER OF LIEN AND AFFIDAVIT

TO:   THE WHITING-TURNER CONTRACTING COMPANY
      *(Contractor)*

RE: WT SUBCONTRACT NO.: _____
OWNER: _____
PROJECT: _____
CURRENT INVOICE NO.: _____
FOR THE PERIOD ENDING: _____

The undersigned Subcontractor, in consideration of the payments previously made and payment for the period covered by the current invoice set forth above, hereby waives and releases all mechanic's, materialman's or other liens and, to the fullest extent permitted by law, all rights to file any such liens in the future, and all claims and demands against Contractor, Owner, their sureties and the real property on which the project is located, in any manner arising out of work, labor, services, equipment or materials, performed or furnished by Subcontractor, its subcontractors, and suppliers, in connection with the Project and subcontract, through the period covered by the current invoice and all previous invoices. The release does not apply to retention, nor to extra work which Subcontractor has been authorized to proceed with by the Contractor, but for which payment has not yet been approved.

Except as noted below, Subcontractor acknowledges and represents that for the period and work covered by all previous invoices for which Subcontractor has received payment:

1. Subcontractor has paid in full all amounts for subcontracts, labor, materials and rented equipment.
2. Subcontractor has properly applied previous payments to pay all outstanding invoices related to the Project.
3. Subcontractor is aware of no claims nor any circumstances that could give rise to any future claims against Contractor, Owner, Architect or other Subcontractor on the Project.
4. All payroll, withholding, sales and other taxes, union benefits, insurance premiums and any other amount required by law, regulation or agreement to be paid in connection with labor, materials, and equipment for the Project have been paid in full.

List exceptions, if any:

Subcontractor represents that the amounts set forth below are correct and that the amount of the current payment due will be applied promptly to full payment of all outstanding amounts due from Subcontractor to others in connection with the Project.

|                                       |      |
| ------------------------------------- | ---- |
| Contract Sum to Date                  | $ _____ |
| Total Completed and Stored to Date    | $ _____ |
| Total Retention to Date               | $ _____ |
| Total Earned Less Retention           | $ _____ |
| Less Previous Payments                | $ _____ |
| Current Payment Due                   | $ _____ |

I hereby certify, under penalties of perjury, that the facts, information and representations set forth above are true and accurate to the best of my knowledge, information and belief.

BY: _____
          *(Name of Subcontractor)*

BY: _____
      *(Signature, Printed Name and Title), Duly Authorized Agent of Subcontractor*

STATE OF _____   )
(CITY)(COUNTY)OF _____   )
                                )to wit:

On this _____ day of _____, _____, appeared before me _____ and he/she made oath in due form of law that the facts, information and representations set forth in the foregoing Subcontractor's Partial Release, Waiver of Lien and Affidavit, are true and accurate to the best of his/her knowledge, information and belief.

_____
          *(Notary Public)*

My commission expires: _____

# SUBCONTRACTOR'S FINAL RELEASE AND AFFIDAVIT

TO:  THE WHITING-TURNER CONTRACTING COMPANY *(Contractor)*     DATE: _____

_____

_____

FROM: _____

RE:  WT SUBCONTRACT NO.: _____ *(Subcontractor)*

   OWNER: _____   DATED: _____

   PROJECT: _____

The undersigned Subcontractor, in consideration of final payment as set forth herein, hereby waives all mechanic's liens and rights to file mechanic's liens and generally releases, and agrees to indemnify and save harmless, The Whiting-Turner Contracting Company and the above Owner and their sureties, their successors and assigns, from all causes of action, suits, debts, contracts, damages, judgments, decrees, claims, bond claims, demands, liens, rights to assert liens, awards and expenses, including attorneys' fees, in law, equity or otherwise, which Subcontractor, its subcontractors and suppliers, their successors and assigns and any persons claiming through them or based upon their acts or omissions ever had, now have or hereafter may have against The Whiting-Turner Contracting Company or the above Owner, and any real property or improvements of Owner, from the beginning of the world to the date of this Release, in any manner relating to or arising in connection with the above referenced contract or project.

Subcontractor represents that the amounts set forth below are correct and that the amount of the current payment due will promptly be applied to full payment of all outstanding amounts due from Subcontractor to others in connection with the Project.

|  |  |
|---|---|
| Final Contract Amount | $ _____ |
| Less Previous Payments | $ _____ |
| Final Payment Due | $ _____ |

I hereby certify, under penalties of perjury, that the information and representations set forth above are true and accurate to the best of my knowledge, information and belief.

BY: _____        Address: _____
        *Subcontractor*

    *Signature,* Duly Authorized Agent of Subcontractor        _____

      *Printed Name and Title*

STATE OF _____

(CITY)(COUNTY) OF _____     )
                                  )
                                  ) to wit:

On this _____ day of _____, _____ appeared before me _____ and he/she made oath in due form of law that the facts, information and representations set forth in the foregoing Final Release and Affidavit, are true and accurate to the best of his/her knowledge, information and belief.

_____
    *(Notary Public)*                    My commission expires: _____

R-002
2/2001

Exhibit F

## TOXIC / HAZARDOUS SUBSTANCES
Contract Insert

Substance          PCB, Asbestos, Lead Paint

"Fischbach & Moore Electric shall have no liability to the extent there are any pre-existing hazardous and/or toxic materials (herein "Hazardous Materials," including but not necessarily limited to lead, asbestos, asbestos-containing materials (ACM's) and/or polychlorinated biphenyls (PCB's) on the site, nor to the extent the control, removal, and/or disposal of any Hazardous Materials is necessitated by the negligence and/or willful conduct or omission of DC WASA, their affiliated companies, their respective directors, officers, agents, representatives and/or employees, provided Fischbach & Moore Electric promptly notifies Whiting-Turner of same upon Fischbach & Moore Electric's discovery thereof, and takes no action to remove same until so directed by Whiting-Turner or DC WASA's.  All such action undertaken by Fischbach & Moore Electric shall be at DC WASA's / Whiting-Turner's additional expense."

**Exhibit G**

**Changes to Articles 4, 5, 6, 7, and 9**

Revise subsection 5(a) as follows, commencing four (4) lines from the end:

> "...owing by the Subcontractor to the Contractor *hereunder* and *reasonable costs necessary to complete the work to be performed under this Subcontract*, and any and all claims liquidated or unliquidated, by the Contractor against the Subcontractor, arising hereunder ~~, under any contract or agreement between the Subcontractor and the Contractor or from any other liability or obligation of the Subcontractor to the Contractor whether under this Subcontractor or otherwise~~."

5(d):  Add this sentence to the end of subsection 5(d):

> "Nothing herein shall be construed to prevent Subcontractor from pursuing its rights, if any, to a mechanic's lien or bond claim, in the event that amounts due Subcontractor hereunder remain unpaid for fifteen (15) days after the due date."

5(e):  Delete subsection 5(e) in its entirety.

**Article 9 – Miscellaneous**

(q):  Add the following clauses:

> *This agreement to arbitrate shall not apply to any claim:*
>
> a) *of contribution or indemnity asserted by one party to this Agreement against the other party and arising out of an action brought in a state or federal court or in arbitration by a person who is under no obligation to arbitrate the subject matter of such action with either of the parties hereto; or does not consent to such arbitration; or*
>
> b) *asserted by the Subcontractor against the Contractor if the Contractor asserts said claim, either in whole or part, against the Owner and the contract between the Contractor and Owner does not provide for binding arbitration, or does so provide but the two arbitration proceedings are not consolidated, or the Contractor and Owner have not subsequently agreed to arbitrate said claim, in either case of which the parties hereto shall so notify each other either before or after arbitration is made.*
>
> *In any dispute arising over the application of this Article, the question of arbitrability shall be decided by the appropriate court and not by arbitration.*

Initialed By:
Contractor _____ Subcontractor: _____

## Exhibit G

## Changes to Articles 4, 5, 6, 7, and 9

### Article 4 – Diligent Performance

(1) Revise the end of subsection (d) as follows:

"(d) In the event ... Subcontractor shall continue to diligently perform the work as directed by Contractor without interruption, deficiency or delay , *so long as Subcontractor receives timely payment for all undisputed work for which Contractor has received payment from Owner.*"

(2) Add the following clauses:

*Schedule and Time of Completion:*

*4(e): Subcontractor shall be afforded an opportunity to establish activities and working time necessary to perform and complete the work under the subcontract agreement. In the event a revised schedule is issued by the Contractor without Subcontractor's input, Subcontractor shall be allowed reasonable and sufficient time, in accordance with industry standards, in which to complete the phases of work.*

*4(f): Subcontractor will be responsible for those activities which are in the direct control of its firm. However, the unreasonable action of other trade contractors and their subsequent impacts upon the project and upon Subcontractor will not be the financial responsibility of Subcontractor and Subcontractor may assert claim for additional compensation. Accordingly, if a recovery schedule is required as a result of factors above and beyond the control of Subcontractor, it shall not be Subcontractor's responsibility to incur any unanticipated cost to accelerate its work. If the unreasonable action of the Subcontractor impacts upon the project and effects the Contractor and any of the Contractor's other subcontractors/vendors in the execution of their work, Subcontractor shall responsible for an equitable adjustment to said parties as well as any reasonable costs to accelerate their work.*

*4(g): To the extent that Subcontractor is required to perform its work in an out of sequence manner at the direction of Contractor or otherwise due to conditions above and beyond its control, Subcontractor may assert a claim hereunder for any additional costs it can reasonably demonstrate it incurs.*

*Delay / Force Majeure:*

*4(h): Subcontractor shall be entitled to the same rights and remedies for delays and cost impacts regarding force majeure as the Contractor is entitled to from the Owner.*

2

Initialed By:
Contractor _____ Subcontractor _____

Exhibit G

## Changes to Articles 4, 5, 6, 7, and 9

### Article 6 – Extras and Omissions

6(e):   Revise as follows:

- 3rd line:  "provided (1) such claim is not, in the *reasonable* judgment of the Contractor, made in bad faith;

- 4th line:  "in the form *reasonably* required by the general Contract ..."

- 5th line:  "...within the time required by the general Contract, but in no event shall Subcontractor have fewer than *three (3)* days to present such claim to Contractor;"

- Last sentence:

    "The decision ... binding on the Contractor , *subject without limitation to all of Subcontractor's contractual, legal and equitable rights and remedies.*"

6(f):   Revise the first sentence as follows:

    "No extras ... natural or physical conditions, *except as permitted by Owner:*

### Article 7 – Default

7(a):  Revise as follows:

- 1st line:     "In the event the Subcontractor shall , in the *reasonable* judgment of the Contractor..."

- 9th line:  "(6) commit any other *material* breach..."

- 12th line:  "notice ... that if, in the *reasonable* judgment of the Contractor..."

- page SC6, 1st line:  DELETE "equipment and tools"

- page SC6, 2d line:  "The *reasonable* amount of completion cost..."

- page SC6, 3rd line:  "...including Contractor's *reasonable*  legal fees..."

- page SC6, 4th line:

    "...under this Agreement ~~or any other agreement between Contractor and Subcontractor~~; and "

3

Initialed By: ___
Contractor ___ Subcontractor: ___

**Exhibit G**

**Changes to Articles 4, 5, 6, 7, and 9**

- page SC6, 6th line: DELETE "equipment and tools"

**7(b):** Revise as follows:

- 3rd line: "…and at Subcontractor's *reasonable* cost and expense…"

**7(c):** Revise as follows:

- 2d line:

"Subcontractor in any right or capacity, ~~whether~~ under this Subcontract ~~or otherwise~~, immediately…"

**7(e):** The last sentence is amended to insert after the last word "Subcontractor:"

"*, and any additional actual out-of-pocket expenses incurred as a result of wrongful termination such as restocking charges, cancellations charges, etc.*"

**Add the following aticles:**

**7(f):** "*In addition, in the event of Contractor's (a) bankruptcy, reorganization, receivership, insolvency, or making an assignment for the benefit of creditors, or (b) evidencing financial or organizational instability, Subcontractor may, upon twenty-four (24) hours notice to Contractor, cease performance of the Subcontract and suspend its Work thereunder until Subcontractor receives reasonable assurance that its right to payment hereunder shall not be adversely impacted thereby.*"

**Article 9 – Miscellaneous**

**(b):** STRIKE "on the condition that this form of Subcontract would be executed, without change or alteration,"

**(e):** Add the following clauses:

"*Neither the Subcontractor nor the Contractor shall be liable to the other party for any indirect, incidental, exemplary, liquidated, punitive or consequential loss or damages, including but not limited to any loss or profit, loss of use, loss of contracts, loss of production or business interruption, except to the extent that Contractor has liability for such damages under the Owner-Contractor agreement and Subcontractor has caused such damages in whole or in part.*"

Initialed By:
Contractor: _____ Subcontractor: _____

## Exhibit G

## <u>Changes to Articles 4, 5, 6, 7, and 9</u>

(p):  Revise as follows:

- 4th-5th line:

"...in connection with *Subcontractor's violation of any of* the aforementioned ~~acts~~ *laws, regulations, and/or orders*, or any rule, regulation or order promulgated thereunder,.."

- 7th line:   "take whatever action is *reasonably* deemed necessary"

- 8th line:   "Any and all *reasonable* costs..."

- 9th line:   "...from any payment due Subcontractor *hereunder*."

Also add the following clause, with regard to subsection (6):

*6(l): "Subcontractor shall have no liability with regard to any such hazard to the extent the abatement, control, removal and/or disposal thereof is necessitated by the negligence and/or willful conduct or omission of Contractor, Owner, their affiliated companies, their respective directors, officers, agents, representatives and/or employees, nor for any pre-existing hazardous materials on the site, provided Subcontractor promptly notifies Contractor of same upon Subcontractor's discovery thereof, and takes no action to remove same until so directed by Contractor or Owner."*

Initialed By:
Contractor: _____ Subcontractor: _____

# PAYMENT BOND

## THE WHITING-TURNER CONTRACTING COMPANY
### 300 EAST JOPPA ROAD
### TOWSON, MARYLAND 21286

BOND NO. SX9388

## KNOW ALL MEN BY THESE PRESENTS:

That FISCHBACH & MOORE ELECTRIC, INC., 7941 Woodruff Court, Suite 101, Springfiled, VA 22151

as Principal, hereinafter called Principal, and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, 5801 Smith Avenue, Baltimore, MD 21209-3693

### (here insert the name, address and state of incorporation of Surety)

as Surety, hereinafter called Surety, are held and firmly bound unto THE WHITING-TURNER CONTRACTING COMPANY, 300 East Joppa Road, Towson, Maryland 21286 as Obligee, hereinafter called Obligee, in the amount of (1)
Dollars ($8,584,200.00), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

(1) EIGHT MILLION FIVE HUNDRED EIGHTY FOUR THOUSAND TWO HUNDRED DOLLARS AND NO CENTS

WHEREAS, Principal has by written agreement dated February 13, 2003 entered into Contract No 9240-16A with Obligee for Rehabilitation of the Bryant Street Pumping Station, 301 Bryant Street, N.W., Washington, DC 20001

in accordance with drawings and specifications prepared by _____
Whitman, Requardt and Associates, LLP

which Contract is by reference made a part hereof, and is hereinafter referred as a Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such, that if the Principal shall promptly make payments to all persons supplying labor, material, rental equipment, supplies, or services in the performance of the said Contract and any and all modifications of said Contract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Contract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall

**COPY FOR YOUR RECORD**

## PERFORMANCE BOND

## THE WHITING-TURNER CONTRACTING COMPANY
### 300 EAST JOPPA ROAD
### TOWSON, MARYLAND 21286

BOND NO. SX9388

## KNOW ALL MEN BY THESE PRESENTS:

That FISCHBACH & MOORE ELECTRIC, INC., 7941 Woodruff Court, Suite 101, Springfield, VA 22151

as Principal, hereinafter called Principal, and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, 5801 Smith Avenue, Baltimore, MD 21209-3693

(here insert the name, address and state of incorporation of Surety)

as Surety, hereinafter called Surety, are held and firmly bound unto THE WHITING-TURNER CONTRACTING COMPANY, 300 East Joppa Road, Towson, Maryland 21286 as Obligee, hereinafter called Obligee, in the amount of (1) Dollars ($8,584,200.00), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.
(1) EIGHT MILLION FIVE HUNDRED EIGHTY FOUR THOUSAND TWO HUNDRED DOLLARS AND NO CENTS

WHEREAS, Principal has by written agreement dated February 13, 2003 entered into Contract No 9240-16A with Obligee for Rehabilitation of the Bryant Street Pumping Station, 301 Bryant Street, N.W., Washington, DC 20001

in accordance with drawings and specifications prepared by Whitman, Requardt and Asoociates, LLP

which Contract is by reference made a part hereof, and is hereinafter referred as a Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such, that if the above bounden Principal shall well and truly perform all the undertakings, covenants, terms conditions, and agreements of said Contract within the time provided therein, any extensions thereof that may be granted by the Obligee, and during the life of any guarantee required under said Contract, and shall well and truly perform all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said Contract that may hereafter be made, and shall pay to said Obligee and save harmless said Obligee of and from any and all loss, damage, and expense, including costs and attorney's fees, which the said Obligee may sustain by reason of

failure so to do. then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Contract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

Whenever Principal shall be declared by the Obligee to be in default under the Contract, the Surety shall, within ten (10) calendar days after notice of default from the Obligee, notify the Obligee of its election either to promptly proceed to remedy the default or promptly proceed to complete the contract in accordance with and subject to its terms and conditions. In the event the Surety does not elect to exercise either of the above stated options, then the Obligee thereupon shall have the remaining work completed, Surety to remain liable hereunder for all expenses, including attorney's fees, of completion.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this ⎯13th⎯ day of ⎯⎯March⎯⎯, ⎯2003⎯, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

FISCHBACH & MOORE ELECTRIC, INC.
_____
Principal

(Seal)

Witness:

_____        By: _____
                                                            Signature

Rosenberg & Parker, Inc.
_____
Bonding Agent                                          _____
                                                        Name and title - type or print
201 N. Presidential Boulevard
_____       ST. PAUL FIRE AND MARINE INSURANCE COMAPNY
                                                                    Surety
Bala Cynwyd, PA 19004
_____
Address                                            By: _____
                                                        Signature  Attorney-in-Fact
(610) 668-9100
_____       Harry C. Rosenberg, Attorney-In-Fact
Phone

PA-016

**The St Paul**

**POWER OF ATTORNEY**

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

Power of Attorney No.                    23718

Certificate No. **1693398**

KNOW ALL MEN BY THESE PRESENTS: That Seaboard Surety Company is a corporation duly organized under the laws of the State of New York, and that St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, and that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, and that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc. is a corporation duly organized under the laws of the State of Wisconsin *(herein collectively called the "Companies"),* and that the Companies do hereby make, constitute and appoint

Harry C. Rosenberg, David C. Rosenberg, Matthew J. Rosenberg, Sherri L. Feeney, David A. Johnson, Christine A. Dunn, Joyce M. Hoffman, Lori A. Addington, and Doug J. Cornforth

of the City of _____ **Bala Cynwyd** _____, State _____ **Pennsylvania** _____, their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety to, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

IN WITNESS WHEREOF, the Companies have caused this instrument to be signed and sealed this **26th** day of _____ **February** _____ **2003**

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

PETER W. CARMAN, Vice President

THOMAS E. HUIBREGTSE, Assistant Secretary

State of Maryland
City of Baltimore

On this _____ **26th** _____ day of _____ **February** _____, **2003** before me, the undersigned officer, personally appeared Peter W. Carman and Thomas E. Huibregtse, who acknowledged themselves to be the Vice President and Assistant Secretary, respectively, of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc.; and that the seals affixed to the foregoing instrument are the corporate seals of said Companies; and that they, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the names of the corporations by themselves as duly authorized officers.

In Witness Whereof, I hereunto set my hand and official seal.
My Commission expires the 1st day of July, 2006.

REBECCA EASLEY-ONOKALA, Notary Public

86203 Rev. 7-2002 Printed in U.S.A.

PAYMENT BOND


THE WHITING-TURNER CONTRACTING COMPANY
300 EAST JOPPA ROAD
TOWSON, MARYLAND 21286


BOND NO. SX9388

KNOW ALL MEN BY THESE PRESENTS:

That FISCHBACH & MOORE ELECTRIC, INC., 7941 Woodruff Court, Suite 101, Springfiled, VA 22151

as Principal, hereinafter called Principal, and ST. PAUL FIRE AND MARINE INSURANCE COMPANY, 5801 Smith Avenue, Baltimore, MD 21209-3693

(here insert the name, address and state of incorporation of Surety)

as Surety, hereinafter called Surety, are held and firmly bound unto THE WHITING-TURNER CONTRACTING COMPANY, 300 East Joppa Road, Towson, Maryland 21286 as Obligee, hereinafter called Obligee, in the amount of (1) Dollars ($8,584,200.00), for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

(1) EIGHT MILLION FIVE HUNDRED EIGHTY FOUR THOUSAND TWO HUNDRED DOLLARS AND NO CENTS

WHEREAS, Principal has by written agreement dated February 13, 2003 entered into Contract No 9240-16A with Obligee for Rehabilitation of the Bryant Street Pumping Station, 301 Bryant Street, N.W., Washington, DC 20001


in accordance with drawings and specifications prepared by _____
Whitman, Requardt and Associates, LLP


which Contract is by reference made a part hereof, and is hereinafter referred as a Contract.


NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such, that if the Principal shall promptly make payments to all persons supplying labor, material, rental equipment, supplies, or services in the performance of the said Contract and any and all modifications of said Contract that may hereafter be made, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The said Surety agrees that no change, extension of time, alteration, addition, omission, or other modification of the terms of either the said Contract or the said Prime Contract, or both, or in the said work to be performed, or in the specifications, or in the plans, shall

in anywise affect its obligation on this Bond, and it does hereby waive notice of any such changes, extensions of time, alterations, additions, omissions, and other modifications.

The said Principal and the said Surety agree that this Bond shall inure to the benefit of all persons supplying labor, material, rental equipment, supplies, or services in the performance of the said Contract, as well as to the Obligee, and that such persons may maintain independent actions upon this Bond, in their own names.

IN WITNESS WHEREOF, the above bounden parties have executed this instrument under their several seals this ___13th___ day of _____March_____, _2003_, the name and corporate seal of each corporate party being hereto affixed and these presents duly signed by its undersigned representative, pursuant to authority of its governing body.

FISCHBACH & MOORE ELECTRIC, INC.
_____
**Principal**

(Seal)

Witness:

_____        By: _____
                                    Signature

                               _____
                               Name and title – type or print

                               ST. PAUL FIRE AND MARINE INSURANCE COMPANY
                               _____
                               **Surety**

                          By: _____
                               Signature  **Attorney-in-Fact**
                               Harry C. Rosenberg, Attorney-in-Fact

Bond No.    SX9388

## RIDER ADDING ADDITIONAL OBLIGEE

To be attached to and form a part of Bond No. SX9388 _____, dated the 13th _____ day of

_____ March _____, 2003 , issued by ST. PAUL FIRE AND MARINE INSURANCE COMPANY _____,

as Surety, on behalf of FISCHBACH & MOORE ELECTRIC, INC. _____,

as Principal in favor of THE WHITING-TURNER CONTRACTING COMPANY _____,

as Obligee.

WHEREAS, upon the request of the Principal and Obligee the attached bond is hereby amended to add

D.C. WATER AND SEWER AUTHORITY (DC WASA) _____, as an additional obligee.

PROVIDED HOWEVER:

1. There shall be no liability under this bond to the Obligees, or either of them, unless the said Obligees, or either of them, shall make payments to the Principal strictly in accordance with the terms of said contract as to payments, and shall perform all of the other obligations to be performed under said contract at the time and in the manner therein set forth, all of the acts of one Obligee being binding on the other.

2. The aggregate liability of the surety under said bond to the joint obligees, as their interests may appear, is limited to the penal sum of said bond.

3. The surety may, at its option, make any payment under said bond by check issued jointly to the joint obligees.

The attached bond shall be subject to all its terms, conditions and limitations except as herein modified.

Signed, sealed and dated this 13th _____ day of _____ March _____, 2003

ACCEPTED:

FISCHBACH & MOORE ELECTRIC, INC.                    ST. PAUL FIRE AND MARINE INSURANCE COMPANY

By: _____                    By: _____
                                                Harry C. Rosenberg, Attorney-in-Fact

THE WHITING-TURNER CONTRACTING COMPANY

By: _____                    By: _____

**The St Paul**

**POWER OF ATTORNEY**

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

Power of Attorney No.    23718                         Certificate No. **1693374**

KNOW ALL MEN BY THESE PRESENTS: That Seaboard Surety Company is a corporation duly organized under the laws of the State of New York, and that St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company and St. Paul Mercury Insurance Company are corporations duly organized under the laws of the State of Minnesota, and that United States Fidelity and Guaranty Company is a corporation duly organized under the laws of the State of Maryland, and that Fidelity and Guaranty Insurance Company is a corporation duly organized under the laws of the State of Iowa, and that Fidelity and Guaranty Insurance Underwriters, Inc. is a corporation duly organized under the laws of the State of Wisconsin *(herein collectively called the "Companies")*, and that the Companies do hereby make, constitute and appoint

Harry C.  Rosenberg, David C. Rosenberg, Matthew J. Rosenberg, Sherri L. Feeney, David A. Johnson, Christine A. Dunn, Joyce M. Hoffman, Lori A. Addington, and Doug J. Cornforth

of the City of _____ **Bala Cynwyd** _____ , State _____ **Pennsylvania** _____ , their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety to, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

IN WITNESS WHEREOF, the Companies have caused this instrument to be signed and sealed this    **26**th    day of _____ **February** _____ **2003**

Seaboard Surety Company
St. Paul Fire and Marine Insurance Company
St. Paul Guardian Insurance Company
St. Paul Mercury Insurance Company

United States Fidelity and Guaranty Company
Fidelity and Guaranty Insurance Company
Fidelity and Guaranty Insurance Underwriters, Inc.

PETER W. CARMAN, Vice President

THOMAS E. HUIBREGTSE, Assistant Secretary

State of Maryland
City of Baltimore

On this _____ **26**th _____ day of _____ **February** _____ **2003**, before me, the undersigned officer, personally appeared Peter W. Carman and Thomas E. Huibregtse, who acknowledged themselves to be the Vice President and Assistant Secretary, respectively, of Seaboard Surety Company, St. Paul Fire and Marine Insurance Company, St. Paul Guardian Insurance Company, St. Paul Mercury Insurance Company, United States Fidelity and Guaranty Company, Fidelity and Guaranty Insurance Company, and Fidelity and Guaranty Insurance Underwriters, Inc.; and that the seals affixed to the foregoing instrument are the corporate seals of said Companies; and that they, as such, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the names of the corporations by themselves as duly authorized officers.

In Witness Whereof, I hereunto set my hand and official seal.

My Commission expires the 1st day of July, 2006.

REBECCA EASLEY-ONOKALA, Notary Public

86203 Rev. 7-2002 Printed in U.S.A.

**StPaul Surety**   St. Paul Fire and Marine Insurance Company     United States Fidelity and Guaranty Company
St. Paul Guardian Insurance Company     Fidelity and Guaranty Insurance Company
St. Paul Mercury Insurance Company     Fidelity and Guaranty Insurance Underwriters, Inc
Seaboard Surety Company     St. Paul Medical Liability Insurance Company.

Bond No. SX9388

### RIDER CONTAINING
### DISCLOSURE NOTICE OF TERRORISM COVERAGE

This disclosure notice is required by the Terrorism Risk Insurance Act of 2002. No action is required on your part. This Disclosure Notice is incorporated in and a part of the attached bond.

You should know that, effective November 26, 2002, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by the Terrorism Risk Insurance Act of 2002. Under this formula, the United States reimburses 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

There is a cap on our liability to pay for such losses if the aggregate amount of insured losses under the Act exceeds $100,000,000,000 during the applicable period for all insured and all insurers combined. In that case, we will not be liable for the payment of any amount which exceeds that aggregate amount of $100,000,000,000.

The portion of your premium that is attributable to coverage for acts of terrorism is $0.00.

**IMPORTANT NOTE: THE COST OF TERRORISM COVERAGE IS SUBJECT TO CHANGE ON ANY BOND THAT PREMIUM IS CHARGED ANNUALLY.**

SIGNED AND SEALED this 13th day of _____ March _____, 20 03.

SURETY: ST. PAUL FIRE AND MARINE INSURANCE COMPANY     [SEAL]

Signature: _____
### Attorney-in-Fact
Harry C. Rosenberg, Attorney-in-Fact

## Financial Statement – December 31, 2001

## St. Paul Fire and Marine Insurance Company

| Assets | | Liabilities, Surplus & Other Funds | |
|---|---:|---|---:|
| Bonds | $ 6,823,230,999 | Losses | $ 6,818,922,768 |
| Stocks | 4,222,614,901 | Reins. Payable on Paid Losses | 39,347,742 |
| Real Estate | 699,908,500 | Loss Adjustment Expenses | 1,596,300,401 |
| Cash on Hand/Deposit | 33,012,305 | Contingent Commissions | 56,891,672 |
| Short Term Investments | 531,963,301 | Other Expenses | 102,287,926 |
| Other Invested Assets | 1,056,112,012 | Taxes, Licenses and Fees | 69,252,283 |
| Receivable for Securities | 34,603,995 | Unearned Premiums | 2,051,341,080 |
| Agents' Balances | 1,772,347,244 | Dividends Unpaid - Policyholders | 26,965,810 |
| Funds held dep. with Reins Co. | 121,538,511 | Ceded reinsurance premiums payable | 171,794,999 |
| Amts billed/ rec'd under high ded. Policies | 73,014,764 | Fund Held - Reins. Treaties | 214,390,873 |
| Reinsurance Recoverable | 190,397,070 | Funds Withheld | 182,348,312 |
| Fed. and foreign income tax recoverable | 324,959,801 | Remittances and items not allocated | 55,635,225 |
| Guaranty Funds Receivable | 8,946,868 | Provision for Reinsurance | 187,841,512 |
| EDP Equipment | 19,990,005 | Adjustment for Foreign Exchange | 75,715,686 |
| Accrued Interest & Dividends | 116,553,028 | Drafts Outstanding | 213,621,808 |
| Receivable from Affiliates | 239,696,861 | Payable to affiliates | 70,779,375 |
| Equity/Deposits/Pools & Assoc. | 45,933,563 | Payable for Securities | 75,648,249 |
| Other Assets | 135,693,995 | Other Liabilities | 297,845,605 |
| | | Special Reserve-Guaranty Fund | 1,000,000 |

TOTAL LIABILITIES        12,307,931,327

| | | |
|---|---:|---|
| Guaranty Surplus Fund | 1,000,000 | |
| Capital Paid Up | 20,000,000 | |
| Surplus | 4,121,586,393 | |

Surplus as Regards Policyholders        4,142,586,393

| | | | |
|---|---:|---|---:|
| TOTAL ASSETS | $16,450,517,720 | TOTAL LIABILITIES & SURPLUS | $16,450,517,720 |

Securities carried at $1,151,107,406 in the foregoing statement, are deposited as required by law.

STATE OF MINNESOTA }
                                          SS
COUNTY OF RAMSEY }

Sheila M. Brown, Assistant Vice President - Financial Reporting, of the St. Paul Fire and Marine Insurance Company, being duly sworn, deposes and says that she is the above described officer of said company; that said company is a corporation duly organized, existing and engaging in business as a surety company under and by virtue of the laws of the State of Minnesota, and has duly complied with all requirements of the laws of said state applicable to said company and is duly qualified to act as surety under such laws; that the above is a true statement of the assets and liabilities of said company of the 31st day of December, 2001.

Subscribed and sworn to before me this 15th day of March, 2002

_M M DuBois_

_Shi M M_

Sheila M. Brown, Assistant Vice President – Financial Reporting

M M DUBOIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2005

d:\fr\statfdeptcomm\paul\1201&m.doc

7941 Woodruff Court  Suite 101  Springfield, VA 22151  703.321.1750  703.321.1756 fax

 **FISCHBACH & MOORE ELECTRIC, INC.**
An InfraSource Company

June 6, 2003

Mr. Terry Dunlap
Vice President
Whiting-Turner Contracting Company
300 East Joppa Road
Baltimore, MD  21286-3047

Re:   Subcontract Agreement with The Whiting-Turner Contracting Company (the "Subcontract") dated February 13, 2002 and all related documents, including but not limited to the prime contract and any and all exhibits, schedules, general and supplementary conditions, drawings, plans, specifications, addenda, modifications and change orders (collectively, the "Contracts"), for the project known as Bryant Street.

Dear Mr. Dunlap:

As we have discussed, Fischbach & Moore Electric, Inc.  ("F&M") is in the process of entering into certain transactions with Sachs Electric Company ("Sachs") with respect to the F&M Washington, D.C./Springfield, Virginia Operations. Specifically, F&M intends to enter into an asset purchase agreement and subcontract agreement with Sachs, pursuant to which F&M's rights and obligations under the Contracts would first be subcontracted to Sachs and then would subsequently be assigned to and assumed by Sachs (such subcontract and assignment and assumption collectively, the "Proposed Arrangement"). This letter serves as notice of the Proposed Arrangement.  The subcontract portion of the Proposed Arrangement is currently anticipated to occur on or around June 23, 2003 and the assignment and assumption portion of the Proposed Arrangement (to the extent of the work under the Contracts is not completed by the of the assignment and assumption date) is currently anticipated to occur at some point within the next year thereafter.

We are hereby requesting your consent to the Proposed Arrangement (including both the subcontract and assignment and assumption portions thereof), and your agreement that the Contracts shall remain in full force and effect immediately following the effective date of both the subcontract portion of the Proposed Arrangement and the assignment and assumption portion of the Proposed Arrangement, unless otherwise terminated other than as a result of the Proposed Arrangement.  Your signature below represents your legally binding consent and agreement to the Proposed Arrangement and the foregoing.  Except as indicated above, all other terms and provisions of the Contracts shall remain in full force and effect, and this letter shall not be deemed to waive, limit or otherwise impair the rights and obligations of the parties to the Contracts.

After countersigning this letter, kindly retain one copy for your records and return one copy to my attention at your earliest possible convenience.

EXHIBIT 3

If you have any questions, please do not hesitate to contact me at (703) 321-1750. We appreciate your prompt attention to this matter.

Very truly yours,

FISCHBACH & MOORE ELECTRIC, INC.

By: _____
Name: W.C. WOOLDRIDGE
Title: VICE PRESIDENT

ACKNOWLEDGED, AGREED AND ACCEPTED:

WHITING-TURNER CONTRACTING COMPANY

By: _____
Name: Terry L. Dunlap
Title: Sr. Project Manager
Date: June 18, 2003



**Sachs Electric**

*employee owned*

REPLY TO:
POST OFFICE BOX 96
ST. LOUIS, MO 63166-0096
636-532-2000
www.sachsco.com

**CERTIFIED MAIL – RETURN REQUESTED**

March 7, 2007

Via Certified Mail/Return Receipt Requested
Receipt No. 7006 2760 0002 5412 7036
and First Class Mail
United States Fidelity and Guaranty Company
Claims Department
385 Washington Street
St. Paul, MN 55102

Dear Sir or Madam:     Re: Our File No. 300008
             Rehabilitation of the Bryant Street
             Pumping Station
             DC WASA Co. No. 01-0050
             W-T Contract No. 9240-16A
             Bond No. 400SN8748

**Notice of Claim on Payment**
**Bond No. 400SN8748**

You are hereby notified that the undersigned claimant, Sachs Electric Company, a Missouri Corporation, furnished electrical labor and materials, to be used and actually used in that – certain work of improvement consisting of the Rehabilitation of the Bryant Street Pumping Station, 301 Bryant Street, N.W., Washington D.C. 20001.

Claimant furnished the materials under contract with The Whiting-Turner Contracting Company, 300 East Joppa Road, Baltimore, Maryland 21286.

The owner or reputed owner of the improvement and property is D.C. Water and Sewer Authority, (DC WASA), 5000 Overlook Avenue, S.W. Washington, D.C.

The unpaid contract price of the labor, services, equipment and/or materials, after deducting all just offsets, if any was and is the sum of THREE MILLION SEVEN HUNDRED EIGHTY-TWO THOUSAND FIVE HUNDRED FORTY-NINE DOLLARS AND FIFTY-EIGHT CENTS ($3,782,549.58) and this sum was and is the reasonable value thereof; and this sum is now due and owing claimant, for and on account thereof, plus interest at the legal rate, and the sum has not been paid.

Wherefore, the undersigned makes demand on the payment bond issued by United States Fidelity and Guaranty Company, 5801 Smith Avenue, Baltimore, Maryland 21209 for the above project.

**EXHIBIT 4**

United States Fidelity and Guaranty Company
Page Two

March 7th, 2007

Kindly forward to the undersigned a Proof of Claim and a request for any other documentation you will need to investigate Sachs' claim. Thank you in advance for your attention to this matter. Please feel free to contact the undersigned at (636)532-2000.

Sincerely,

SACHS ELECTRIC COMPANY


Steven T. Gorman
Vice President
Automation and Industrial

STG

cc:    Mr. Clayton M. Scharff – Sachs Electric
       Mr. Patrick A. Kriegshauser – Sachs Electric
       Ms. Jenny Schnackenberg– Sachs Electric
       Mr. Edward J. Thiemann – Sachs Electric

       The Whiting Turner Contracting Company          Via Certified Mail/Return Receipt Requested
              Attention: Mr. Alexander Sutherland      Receipt No. 7006 2760 0002 5412 7043
              300 East Joppa Road
              Baltimore, Maryland 21286


       St. Paul Travelers Insurance Company            Via Certified Mail/Return Receipt Requested
              Attention:  Mr. Ed Giesler               Receipt No. 7006 2760 0002 5412 7050
              940 Westport Plaza, Suite 300
              Maryland Heights, Missouri  66852

       United States Fidelity and Guaranty Company
              5801 Smith Avenue                        Via Certified Mail/Return Receipt Requested
              Baltimore, Maryland 21209                Receipt No. 7006 2760 0002 5412 7067

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

THE WHITING TURNER CONTRACTING COMPANY
ATTN: MR. ALEX SUTHERLAND
300 EAST JOPPA ROAD
BALTIMORE, MARYLAND 21286

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _E. Evans_    ☒ Agent   ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
E. Evans    MAR 1 2 2007

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☐ Certified Mail     ☐ Express Mail
   ☐ Registered     ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7006 2760 0002 5412 7043

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540



**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com₈

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ .39 |
| Certified Fee | 2.40 |
| Return Receipt Fee (Endorsement Required) | 1.85 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.64 |

FENTON, MO
USPS
MAR 2007 Postmark Here
63026-9998
500000

ALEX SUTHERLAND

Sent To
THE WHITING TURNER CONTRACTING COMPANY
Street, Apt. No.; or PO Box No.
300 EAST JOPPA ROAD
City, State, ZIP+4
BALTIMORE, MARYLAND 21286

PS Form 3800, August 2006     See Reverse for Instructions

7006 2760 0002 5412 7043

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

UNITED STATES FIDELITY AND
GUARANTY COMPANY
CLAIMS DEPARTMENT
385 WASHINGTON STREET
ST. PAUL, MN 55102

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____    ☐ Agent
                     ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                 MAR 1 0 2007

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7006 2760 0002 5412 7036

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ .39 |
| Certified Fee | 2.40 |
| Return Receipt Fee (Endorsement Required) | 1.85 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.64 |

7006 2760 0002 5412 7036

Sent To
UNITED STATES FIDELITY & GUARANTY COMPANY CLAIMS DEPT
Street, Apt. No.;
or PO Box No. 385 WASHINGTON STREET
City, State, ZIP+4 ST. PAUL, MN 55102

PS Form 3800, August 2006    See Reverse for Instructions

FENTON MO
2007
9998

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

ST. PAUL TRAVELERS INSURANCE CO.
ATTN: MR. ED GIESLER
040 WESTPORT PLAZA, SUITE 300
MARYLAND HEIGHTS, MO 64852

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Harland M. Oben_  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

HARLAND M. HORN

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
   (Transfer from service label)    7006 2760 0002 5412 7050

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ .39 |
| Certified Fee | 2.40 |
| Return Receipt Fee (Endorsement Required) | 1.85 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.64 |

FENTON, MO
Mail
Postmark
Here
8
2007
USPS 63026-9998

Sent To
ST. PAUL TRAVELERS INSURANCE CO., ED GIESLER
Street, Apt. No.; or PO Box No. 040 WEST PORT PLAZA SUITE 300
City, State, ZIP+4 MARYLAND HEIGHTS, MO 64852

PS Form 3800, August 2006    See Reverse for Instructions

7006 2760 0002 5412 7050



JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I. (a) PLAINTIFFS**

Sachs Electric Company

**DEFENDANTS**

United States Fidelity and Guaranty Company

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Seth A. Robbins, Esq.
Quagliano & Seeger, P.C.
2620 P Street, N.W.
Washington, D.C. 20007     Phone: 202-822-8838

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

● 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ● 2 | ● 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

# IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☒ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Plaintiff brings this claim under the District of Columbia Little Miller Act.

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 3,584,480.55    JURY DEMAND: Check YES only if demanded in complaint    YES ☐    NO ☒

## VIII. RELATED CASE(S) IF ANY

(See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE January 2, 2007    SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.